2022 IL App (1st) 210261

No. 1-21-0261

Second Division
November 15, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 18 CR 8763 |
| v. | ) ) | |
| ALFONZO CARTER, | ) ) | Honorable Stanley Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Ellis concurred in the judgment
and opinion.

**OPINION**

¶ 1     Following a jury trial, defendant-appellant Alfonzo Carter was found guilty of two counts

of criminal sexual assault (720 ILCS 5/11-1.20(a)(4) (West 2016)) and sentenced to 11 years'

imprisonment. On direct appeal, he argues that the evidence was insufficient to find him guilty

beyond a reasonable doubt; the trial court erred in denying his motion *in limine* and allowing the

State to elicit testimony in violation of the rape shield statute (725 ILCS 5/115-7(a) (West 2020));

the trial court improperly denied his motions for a directed verdict, a new trial, and for judgment

notwithstanding the verdict; the criminal sexual assault statute under which he was convicted is facially unconstitutional; and he was entitled to additional presentence custody credit for his time spent on electronic home monitoring (EHM). For the reasons that follow, we affirm.

¶ 2                                I. BACKGROUND

¶ 3     As a preliminary matter, we note that the record on appeal is incomplete in violation of Illinois Supreme Court Rule 321 (eff. Oct. 1, 2021), which provides for the filing of the record on appeal. It is the appellant's burden "to present a sufficiently complete record of the proceedings at trial to support a claim of error." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391 (1984). Defendant was made aware of the incompleteness of the record via the State's brief and, after briefing was completed, filed a motion to supplement the record, which this court granted. The supplemental record contains copies of defendant's missing motions, to wit, his motion *in limine*, motion to dismiss, posttrial motion, and post sentencing motion. However, the record is still missing the State's response to defendant's motion to dismiss, the State's motion *in limine* regarding the rape shield statute, transcripts prior to July 5, 2018, and the trial exhibits. We provide the following background based on the record before us, noting any gaps in the record.

¶ 4                             A. Pretrial Proceedings

¶ 5     On June 26, 2018, defendant was indicted on two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(4) (West 2016)). Count I of the indictment alleged that, on or about April 20, 2018, he knowingly committed an act of sexual penetration upon J.K. when J.K. was at least 13 years of age but under 18 years of age and defendant was 17 years of age or over and held a position of trust, authority, or supervision in relation to J.K. Count II was substantially the same, differing only with respect to the date, *i.e.*, on or about April 27, 2018.

¶ 6    On August 8, 2018, the trial court permitted defendant to go to work from 7 a.m. to 7 p.m. while on EHM. The court noted at that time that, if defendant was found guilty and sentenced to a term of imprisonment, he would not receive credit for the time spent on EHM with work release. On October 15, 2018, the court reiterated the same to defendant but stated that "[f]rom this day forward" he would not receive credit for time spent on EHM.

¶ 7    On January 17, 2020, a hearing was held on defendant's motion to dismiss the indictment. His motion alleged that the statute at issue (720 ILCS 5/11-1.20(a)(4) (West 2018)), was unconstitutional on its face. Specifically, he argued that, because the age of consent in Illinois is 17 years old, the statute infringed upon the fundamental rights of 17-year-olds by proscribing sexual relations between those older than 17 years old and individuals over 18 years of age who are in a position of trust, authority, or supervision. The motion was denied.

¶ 8    On January 21, 2020, the court conducted a hearing on defendant's motion *in limine*. In that motion, defendant requested that he be permitted (1) to present evidence and cross-examine J.K. on her drug use and addiction, specifically related to Xanax, and (2) to introduce evidence that J.K. had been treated for a sexually transmitted disease (STD) a year prior to the allegations against defendant, which contradicted her statements that she had never had sex previously. Attached to the motion were photographs of a female with a pill-shaped capsule on her tongue, as well as a fact sheet from the Drug Enforcement Administration on benzodiazepines (which include Xanax).

¶ 9    As to the drug use, the State argued before the court that there is no evidence that the pill in the photo is Xanax, no evidence that the pill shown was not prescribed to J.K., and no evidence that J.K is a drug addict. As to the STD treatment, the State argued that evidence showing that J.K. had been untruthful when she stated that she had not had sex prior to these incidents would be

impeachment on a collateral issue and should not be permitted at trial. The State further argued that the evidence that she had been treated for an STD in the past would violate the rape shield statute.

¶ 10    The court denied defendant's motion as to both issues. In ruling, the court stated that the photograph "merely shows a girl with a tongue sticking out with something on her tongue, that's all it shows," and that it would not be a "good faith question" to ask J.K. if that pill was Xanax. Further, the court stated that "whether [J.K.] had sex before or not is really irrelevant" as well as collateral and any questioning on that would violate the rape shield statute.

¶ 11                                B. Jury Trial

¶ 12    The case proceeded to a jury trial, at which the following evidence was presented.

¶ 13    J.K. testified that, in 2018, at the time of these offenses, she was 16 years old and she lived in Berwyn, Illinois with her parents and her brother. In 2018, she attended the church that her and her family, including her grandmother, aunts, and great-grandmother, attended her entire life. She attended service at the church every Sunday. She identified defendant as a family friend and the assistant pastor at the church. She stated she had known defendant her entire life and would see him every Sunday. She testified that defendant taught Sunday school, sang in the choir, and occasionally preached when the main pastor, Pastor Thomas Evans, who was defendant's cousin, was not available. She attended Sunday school most Sundays. She later testified that she trusted defendant.

¶ 14    In April 2018, she began to have more contact with defendant. She testified that on Sunday, April 15, 2018, after the service, he gave her a hug and touched her thigh. She stated that she did not think much of him touching her thigh at the time because it had never happened before. Around this time, she began communicating with defendant via Facebook messenger. J.K. stated that she

was having some difficulties at school, her best friend had recently died, and she "looked to him as a mentor to help [her] with those problems." She testified that they would also communicate through phone calls. At some point, after the incident where he touched her thigh, defendant asked her if she was sexually active, and she responded, "No." He then told her that he would teach her.

¶ 15    The calls became more frequent after that conversation, and a few days later, J.K. agreed to meet with defendant at 3 a.m. in the alley near her grandmother's house. At that time, she left the house and walked to the alley, where defendant's car, a gray sports car, was parked. J.K. testified that it had already been agreed that they were going to have sex in his car. J.K. entered the front passenger's side door. Defendant was in the driver's seat. Defendant removed one of the legs of her leggings and leaned the passenger seat back. Defendant then inserted his penis into J.K.'s vagina three times. She testified that a condom was not used. Defendant stopped, remarking that J.K. looked scared. J.K. testified that she was upset at having agreed to have sex with defendant. She then put her leggings back on and went back into the house. That night, she was unable to fall asleep because she was thinking about what had just happened with defendant. She testified that she did not know the exact date of this incident but that it was after April 15.

¶ 16    After that incident, J.K. went to a water park resort with Pastor Evans and the pastor's cousins. While on this trip, she continued to communicate with defendant via cell phone at night.

¶ 17    The following week, on Thursday, April 26, J.K. stayed the night at her grandmother's house. On this night, she again met defendant in the alley around 3 a.m. on April 27. This arrangement was made through messages with defendant on her cell phone. Prior to the meeting, they had discussed what was going to happen. J.K. testified that she knew they were going to have sex and that defendant asked her to give him oral sex and she declined. She also told defendant that he had to use a condom this time because she did not want to get pregnant. She again entered

into the passenger's seat of defendant's car. He told her to get into the back seat. Defendant took one of her pants legs off and put a condom on his penis. He inserted his penis into her vagina for three minutes. J.K. testified that, as this was happening, she was thinking that she was being taken advantage of. Afterwards, she walked back to her grandmother's house. She was unable to fall asleep because she felt bad about what happened and she knew it was wrong. She did not tell anyone what happened with defendant immediately after or in the next couple days.

¶ 18    J.K. testified that defendant wanted to meet her again on May 5, which was a Saturday. On that day, J.K. was at her grandmother's house. Defendant wanted to meet her earlier, and her brother and grandmother were present in the house. Defendant insisted on coming to the house. J.K. snuck him in through the back door and let him into the back bedroom. Defendant instructed J.K. to delete all of their messages and phone calls from her phone, which she did in his presence. They then spoke about having sex, and J.K. agreed. J.K. stated that she heard her grandmother moving in the house and she quickly left the room and exited out the front door of the house. Her grandmother entered the room as J.K. was leaving. J.K. said "bye" to her brother who has outside with his friends and walked to her school. She was gone for a few hours until her aunts found her and brought her back to her grandmother's house. While she was at the school, she thought about how she was going to be in trouble.

¶ 19    When she returned to the house, her parents, her brother, and her aunts were there. J.K. told her mother what happened with defendant. Her mother called Pastor Evans. The next day, Sunday, Pastor Evans brought J.K. to church, and she stayed in his office during the service because she did not want to see defendant. She then went to a meeting with Pastor Evans, defendant, her parents, and two of her uncles. After that day, she and her family did not attend that church again. On May 9, her mother called the police, and later her parents took her to Lurie's

Children's Hospital to be examined. J.K. testified that they waited until May 9 to go to the police because they "didn't know how [they] were going to go forward about the situation."

¶ 20    J.K. testified that the clothes she was wearing during each of the incidents with defendant were washed prior to May 5. She identified a screenshot from her phone of defendant's Facebook profile, which showed him with his wife and also him preaching at the church. She also identified a screenshot of a conversation on Facebook messenger between herself and defendant. The conversation, for which the date was unknown, showed that at 6:34 p.m. defendant messaged J.K., "nope, I'm about to call you," to which J.K. replied, "my phone gonna die." Another screenshot from J.K.'s phone showed a since deleted Facebook post from defendant, which read: "Sometimes it's good to just stop by and check on friends, family and loved ones, got a chance to see Sister [J.K.'s grandmother] today only to find out she wasn't feeling too well, but we got a chance to sit down and talk, talk out—talk about the Lord and even talk about a little basketball with [J.K.'s brother] and friends. Thanks, [J.K.] for *** setting up the surprise with, but not the disappearing you pulled on us ***." J.K. testified that she did not set up a surprise for defendant to come visit her grandmother. Finally, she identified photographs of defendant's car, the meeting location in the alley, and the basketball court near where defendant parked.[1]

¶ 21    During cross-examination, J.K. stated that her mother suggested that the first incident occurred on April 20. J.K. was not certain that was the correct date, but she knew it was around that time. She also initially confirmed that on April 19, she stayed at her grandmother's house but later corrected herself and stated that she went to the water park with Pastor Evans on that day. She explained that she gave the date of April 20 to the police, even though she was out of town on

---

[1]The exhibits accompanying this testimony were not included in the record on appeal.

that date, because her mother suggested it and she was in distress at that time. She later stated that she generally stayed at her grandmother's house on Thursdays, but she could stay on any day. When questioned as to why she agreed to meet defendant a second time if she had felt so bad after the first incident, she answered that she "did not know how to say no." J.K. stated that she did not remember telling the police officer that she did not have the clothes she was wearing during those incidents. She stated that she told the police that the clothes had been washed.

¶ 22    On redirect examination, she testified that she stayed at her grandmother's house the night before she went to the water park with Pastor Evans and that Pastor Evans picked her up from her grandmother's house on April 19.

¶ 23    J.K.'s grandmother testified that in 2018 she would see J.K. about twice per month. J.K. would come to stay at her house some days, although they were never any particular day of the week. She had attended the church where defendant was serving as assistant pastor for 40 years, and J.K. had attended for her entire life until these events. In addition to serving as the assistant pastor, defendant taught Sunday school and bible study, and he would take over as pastor when Pastor Evans was not available.

¶ 24    On the evening of May 5, 2018, J.K.'s grandmother was at her home with J.K. and her brother. She heard the back door open and asked J.K. what she was doing. J.K. responded that she was taking out the trash, but J.K.'s grandmother saw the trash in the kitchen. She went to investigate and passed J.K. exiting the back bedroom. When J.K.'s grandmother entered the bedroom, she saw a person standing in the closet. She stated to the person, "[B]ring your a** out of there." She discovered it was defendant, and she asked what he was doing there. He responded that he heard she was sick and he wanted to surprise her. J.K.'s grandmother testified that she was not sick that day and defendant had never visited her before when she was sick. She and defendant

went into the living room, and defendant stayed to watch a basketball game with J.K.'s brother and his friends. She did not know where J.K. had gone. J.K.'s mother arrived at the house about 30 minutes later. J.K.'s grandmother told her mother that J.K. left the house and she did not know where she was. They left the house to look for J.K., and at that time, defendant also left the house and walked away. J.K. was eventually found around 1 a.m. at the high school.

¶ 25    J.K.'s brother, who was 19 years old at the time of trial, testified that he lived with his grandmother and that he had attended the church every Sunday for his entire life. He testified that he would see defendant at church every Sunday. On May 5, 2018, he was outside of his grandmother's house with his friends, and he saw J.K. run out of the house. She hugged him, told him she loved him, and ran away. Because of this interaction, which was not typical of her, he believed that something was wrong. He then went inside and told his grandmother that J.K. had run away somewhere. He noticed that defendant was also in the house, although he did not see him enter the house at any point. J.K.'s brother testified that he spoke with defendant that evening about the basketball game they were watching, and defendant stayed for about 30 minutes. He further testified that he had never known defendant to visit his grandmother previously and he found it unusual that defendant was at the house.

¶ 26    J.K.'s mother testified that she had attended the church where defendant was serving as assistant pastor her entire life, along with most of her family, and she knew defendant her entire life. She testified that, in addition to serving as assistant pastor, defendant sang in the choir and taught Sunday school and sometimes bible study. He would also preach on Sunday when Pastor Evans was not present. She testified that she trusted defendant because "[h]e was a man of God, [they] grew up together, [they] were in the same church." She stated that J.K. typically stayed at her grandmother's house on Thursday nights because J.K. attended a youth group on Thursdays

that was closer to her grandmother's house. On May 5, she had left J.K.'s grandmother's house to pick up food from TGI Friday's. When she returned around 5 p.m., J.K.'s brother, his friends, J.K.'s grandmother, and defendant were inside watching a basketball game. She testified that she was surprised to see defendant there because he had never before visited her or J.K.'s grandmother. J.K.'s brother told her that J.K. was gone, which she found unusual because it was after dark. At some point, defendant left the house. J.K.'s grandmother informed her mother of how defendant was found in the house, and she discovered that J.K. had left her phone at the house. Several family members went out to look for J.K. J.K.'s mother testified that, when she was found, J.K. was "crying and shaken, upset." J.K. informed her that she had run away because she and defendant had had sex and that is why he was at the house that day, but it did not happen because J.K.'s grandmother found them. At this point, J.K.'s mother contacted Pastor Evans, and he came to the house on Sunday before church. Later that day, at the church, there was a meeting with defendant, Pastor Evans, and J.K. J.K.'s mother stated that she was not satisfied with the results of the meeting. A couple days later, she called the police and subsequently took J.K. to the Children's Advocacy Center and Lurie Children's Hospital.

¶ 27   Pastor Evans testified that he has served as a pastor at the church for the past 20 years. He has known J.K. and her brother their entire lives and had an excellent relationship with their family, who attended the church every Sunday. He stated that he took J.K. to a water park from April 19 to April 21, 2018. He picked up J.K. from her grandmother's house on April 19. Early on Sunday, May 6, he received a text message from J.K.'s mother and called her. He took J.K. to church, but J.K. stayed in his office during the service. After the service, he facilitated a meeting with defendant, J.K., and her mother. Pastor Evans further testified that defendant did not return to the

church after that Sunday. Finally, Pastor Evans stated that defendant only taught the adult Sunday school class and J.K. was never defendant's student.

¶ 28 Sarah Monaco, a nurse practitioner at Lurie, testified that she treated J.K. on May 10. Over defendant's objection, she testified that she took a patient history, and her records indicated the following: "patient reports to me that the offender would call her a lot, that he would ask her questions about if she was sexually active. When the patient told the offender she was not sexually active, patient told me the offender asked her if could show her or teach her about sex. Patient reports she had unprotected vaginal to penile sex with the offender in his car on April 20. She also reports she had protected vaginal to penile sex with a condom on 4/27 in his car. The last sexual encounter was on 4/27." Nurse Monaco did not conduct an internal exam because J.K. was not complaining of any symptoms and she would not have been able to confirm whether J.K. had had sexual intercourse on April 27. J.K.'s physical exam was normal. On cross-examination, Nurse Monaco confirmed that she could not present any scientific or medical evidence corroborating J.K.'s report of the incidents.

¶ 29 Chicago police officer Sarah Lacino testified that, on May 8, 2018, she was assigned to take a report of a sexual assault. She went to J.K.'s grandmother's house and met with J.K., her parents, her grandmother, and one of J.K.'s aunts. She spoke to J.K. and her mother and generated a report based on that conversation. On cross-examination, Office Lacino testified that she believed that J.K. informed her that she did not have the clothes she was wearing during either of the incidents.

¶ 30 Chicago police detective Marina Makropoulos testified that she was assigned to investigate J.K.'s allegations of sexual assault. During her investigation, she reported the alleged sexual assault to DCFS, and she was unable to locate defendant's Facebook profile. She interviewed

J.K.'s mother and grandmother. She did not personally interview J.K. but reviewed the interview conducted at the Children's Advocacy Center. After that interview, Detective Makropoulos directed J.K.'s mother to take her to the hospital for an examination. She obtained surveillance video recordings from a garage near J.K.'s grandmother's house from May 5, but she was unable to obtain video recordings from April 20 or April 27. According to Makropoulos, the video on May 5 showed a gray Dodge Charger or Challenger with two doors driving down the alley near J.K.'s grandmother's house, and she confirmed that the car in the video was registered to defendant.[2] Detective Makropoulos also acquired J.K.'s cellphone, which was sent to the forensic lab to retrieve the cellular data. On cross-examination, she confirmed that no one informed her that J.K. had been out of town from April 19 to April 21.

¶ 31    John Clisham testified that he is employed by the Chicago Regional Computer Forensic Laboratory. He testified that he examined defendant's cell phone and there was no information recovered prior to May 23. Clisham attributed this to a factory reset, manual deletion of the information, or the purchase of a new phone. He confirmed that between May 23 and May 29, 2018, there were no phone calls or text messages between defendant and J.K. He also testified that he was unable to recover any deleted call logs or text messages from J.K.'s phone. He was able to gather data from April 14 to May 10, 2018, but not further back, which could have been due to memory storage on her phone or manual deletion. The data showed that 18 calls were exchanged between J.K. and defendant's phones between April 24 and May 6, 2018.[3]

---

[2]This surveillance video and the still photographs taken from the video recording were not included in the record on appeal.

[3]The exhibits accompanying Clisham's testimony were not included in the record on appeal.

¶ 32    Finally, the parties stipulated as to the Sprint cell phone number registered to defendant and the cell phone number registered to J.K. during the relevant time period. The State introduced evidence showing the phone calls provided by Sprint between the two phone numbers for defendant's billing period spanning March 28 to April 27, 2018. The log showed 19 calls between the two phone numbers on several dates between April 4 and April 26, 2018, with the calls spanning in length from one minute to one hour.

¶ 33    The State rested. Defendant filed a motion for a directed verdict, which the court denied.

¶ 34    There was a stipulation that Kalonee Bullock would testify if called as a witness that she was 18 years old and both she and her mother were members of the same church attended by defendant, J.K., and her family. Bullock would testify that on April 19, 2018, she went on a trip to a water park resort and J.K. was also on the trip. She would further testify that they stayed at the resort for two nights and returned home on April 21. The defense rested.

¶ 35    The jury found defendant guilty of both counts of criminal sexual assault.

¶ 36                        C. Posttrial Motions and Sentencing

¶ 37    Defendant filed a motion for a new trial, arguing that (1) the court erred in denying his motions *in limine*, (2) the evidence was insufficient to find defendant guilty, (3) the State made improper statements during its closing argument, and (4) the court erred in denying his motion to dismiss. After hearing arguments from the parties, the trial court denied the motion.

¶ 38    A sentencing hearing was held, after which the trial court sentenced defendant to consecutive terms of 66 months on each count, for a total of 11 years' imprisonment. Defendant was given 338 days of custody credit, over defendant's objection that he was entitled to more credit for the entire EHM period. He also filed a motion to correct his sentence, arguing that he was entitled to 604 days for the time spent on electronic monitoring. On January 29, 2021, the trial

court denied this motion. In so ruling, the court noted that, pursuant to section 5-4.5-100 of the Unified Code of Corrections (Pub. Act 101-652, § 10-281 (eff. July 1, 2021) (amending 730 ILCS 5/5-4.5-100)), sentencing credit for EHM is proscribed for defendants sentenced to a term of imprisonment for the offense of criminal sexual assault. The court acknowledged the sentencing credit previously awarded to defendant was in error, but the court would not revoke that credit. As such, defendant's postsentencing motion was denied, and defendant's credit remained at 338 days.

¶ 39    This appeal followed.

¶ 40                                    II. ANALYSIS

¶ 41    Defendant asserts the following claims of error: the evidence was insufficient to prove him guilty beyond a reasonable doubt; the trial court erred in denying his motions *in limine* regarding J.K.'s alleged drug usage and sexual activity; the trial court erred by admitting evidence in violation of the rape shield statute; the trial court erred in denying his motions for a directed verdict, for judgment notwithstanding the verdict, and for a new trial; the statute for criminal sexual assault is unconstitutional on its face; and defendant is entitled to 602 days of presentencing custody credit.

¶ 42    At the outset, we once again point out that the record before us is incomplete. Pursuant to Illinois Supreme Court Rule 321 (eff. Oct. 1, 2021), the entire common-law record means "every document filed, judgment, and order entered, and any exhibit offered and filed by any party." The appellant bears the burden of presenting an adequate record on appeal to support his claim of error. *People v. Hunt*, 234 Ill. 2d 49, 58 (2009). In the absence of a complete record, we will presume that the trial court's order was in conformity with the law and had a sufficient factual basis. *Foutch*, 99 Ill. 2d at 391-92. Any doubts that may arise from the partial record are resolved against the appellant. *Id.* at 392.

¶ 43                          A. Sufficiency of the Evidence

¶ 44 We begin with defendant's claim that the evidence was insufficient to find him guilty beyond a reasonable doubt as to both counts of criminal sexual assault. To that end, he argues that (1) J.K. was not a credible witness; (2) it was factually impossible for defendant to have committed criminal sexual assault on April 20, 2018, based on the trial testimony; (3) there was no physical evidence of sexual activity between defendant and J.K.; and (4) the evidence failed to prove that defendant was in a position of supervision, authority, or trust in relation to J.K.

¶ 45 When a defendant challenges the sufficiency of the evidence against him, this court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A reviewing court will not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness's testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). A defendant's conviction will be reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 46 The State has the burden of proving beyond a reasonable doubt each element of an offense. *People v. Gray*, 2017 IL 120958, ¶ 35. As charged here, a defendant commits criminal sexual assault if he or she "commits an act of sexual penetration and *** is 17 years of age or over and holds a position of trust, authority, or supervision in relation to the victim and the victim is at least 13 years of age but under 18 years of age." 720 ILCS 5/11-1.20(a)(4) (West 2018). There is no dispute that J.K. was between the ages of 13 and 18 or that defendant was 17 years of age or older.

¶ 47 However, defendant can hardly be heard to complain regarding the sufficiency of the evidence, where, by his own omission, the trial exhibits have not been provided to this court in violation of Illinois Supreme Court Rule 321 (eff. Oct. 1, 2021). Without the trial exhibits, we cannot review all of the evidence the jury relied upon in finding defendant guilty. We note that any doubts arising from the incompleteness of the record must be resolved against defendant. *Id.*; see also *People v. Fernandez*, 344 Ill. App. 3d 152, 161 (2003). Further, we presume that the trial court and, by extension in this case, the jury acted in conformity with the law and had a sufficient factual basis for finding the defendant guilty. See *Foutch*, 99 Ill. 2d at 392. However, even reviewing the partial record before us, we find defendant's contentions regarding the sufficiency of the evidence are meritless.[4]

¶ 48 Defendant first challenges J.K.'s credibility. In support of this contention, he enumerates a the following discrepancies in her testimony: (1) she told the police that the first incident took place on April 19, but she was out of town on that day; (2) she testified that she had washed the clothes she wore on the two incidents, and the police did not ask her about the clothes, but a police officer testified that she told him that she no longer had any of the clothes; (3) she testified that she told her brother goodbye when she left her grandmother's home, but her brother testified that she never used those words; (4) she lied to her grandmother about taking out the trash; (5) J.K.'s mother did not take her to the police or the hospital immediately because she wanted to find out the truth. According to defendant, the evidence showed that J.K. lied multiple times and "her

---

[4]Notwithstanding our decision to review defendant's claims on appeal, the failure to file a complete record, especially the trial exhibits, is no small matter and counsel's misstep in this regard should not be taken lightly.

testimony was so fraught with inconsistencies and contradictions that her testimony was so lacking in credibility that a reasonable doubt of defendant's guilt remains."

¶ 49    The jury heard the evidence in this case, and each of the weaknesses that defendant points out before this court were presented to, and apparently rejected by, the jury. We afford great deference to the factfinder's assessment of a witness's credibility because the factfinder is in a better position "to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Nonetheless, "that deference does not extend to testimony that is 'so lacking in credibility that a reasonable doubt of defendant's guilt remains.' " *People v. Parker*, 2016 IL App (1st) 141597, ¶ 29 (quoting *People v. Schott*, 145 Ill. 2d 188, 207 (1991)).

¶ 50    We find that none of the inconsistencies pointed out by defendant render J.K.'s testimony wholly unbelievable. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 85 ("Minor inconsistencies in the testimony between witnesses or within one witness's testimony may affect the weight of the evidence but do not automatically create a reasonable doubt of guilt."). The discrepancies involving the date of the first incident, the words she said to her brother, and what happened with her clothing are all minor issues. J.K.'s lie to her grandmother regarding taking the trash out is also of no moment. Lastly, we decline to read her mother's hesitancy to call the police before speaking to Pastor Evans and defendant as an affirmative indication that she believes her daughter lied about the sexual assault. Further, testimony need not be rejected merely because of a delay in reporting. *Id.*; see also *Parker*, 2016 IL App (1st) 141597, ¶ 33 (finding that a month-long delay in reporting sexual assault did not render the victim's testimony unbelievable).

¶ 51    Moreover, J.K.'s testimony regarding May 5 was largely corroborated by the testimony of her mother, grandmother, and brother. The record also suggests that evidence was submitted in the

form of phone records and photographs of defendant's vehicle that would tend to corroborate portions of J.K.'s testimony regarding the circumstances of these incidents. Of course, because we do not have these exhibits before us and we cannot attest to their contents, we must construe their absence against defendant. See *Foutch*, 99 Ill. 2d at 392. Thus, viewed in the light most favorable to the State, J.K.'s testimony is not so improbable, unconvincing, or contrary to human experience that no reasonable factfinder could have found her credible. See *People v. Cunningham*, 212 Ill. 2d 274, 284 (2004) (finding that nothing in the record demonstrated that the entirety of the witnesses' testimony as unworthy of belief).

¶ 52    Defendant next contends that it was impossible for a jury to find him guilty of criminal sexual assault occurring on April 20, 2018, because the testimony at trial affirmatively showed that J.K. was out of town that night at a water park resort. We reject this argument for the reasons that follow.

¶ 53    Generally, the State is "not required to prove that a crime was committed on a particular date, unless the allegation of a particular time is an essential ingredient of the offense, or a statute of limitations question is involved." *People v. Suter*, 292 Ill. App. 3d 358, 363 (1997). The State is only required to "at least give some indication in the indictment as to when the offenses occurred." *People v. Guerrero*, 356 Ill. App. 3d 22, 27 (2005); see also 725 ILCS 5/111-3(a)(4) (West 2020). Additionally, "[t]he date of the offense is not an essential factor in child sex offenses." *Guerrero*, 356 Ill. App. 3d at 27 (citing *People v. Burton*, 201 Ill. App. 3d 116, 123 (1990)).

¶ 54    Further, the jury in this case was given the appropriate jury instruction, Illinois Pattern Jury Instruction, Criminal, No. 3.01 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.01), stating as much. See *People v. Sims*, 2019 IL App (3d) 170417, ¶ 38 ("When proof at trial suggests

the offense occurred on a date other than the one charged, IPI Criminal No. 3.01 serves to inform the jury that the difference in dates is not material."). In particular, this instruction stated: "The indictment states that the offense charged was committed on or about April 20, 2018 and April 27, 2018. If you find the offense charged was committed, the State is not required to prove that it was committed on the particular date charged."

¶ 55     Here, there was sufficient evidence presented at trial that two separate acts of criminal sexual assault occurred based on J.K.'s testimony. Moreover, she testified credibly that the first incident occurred sometime after April 15 (when defendant touched her thigh) and before she went to the water park resort on April 19. J.K. later clarified that she had stayed at her grandmother's house the night before the trip to the water park resort. There was also testimony that J.K. generally stayed at her grandmother's house on Thursdays but that she could stay there any day of the week. Finally, the testimony showed that Pastor Evans picked up J.K. from her grandmother's house on April 19, 2022. From this and the reasonable inferences flowing therefrom, the jury could conclude that the first incident occurred close in time to April 20, 2018. See *Jackson*, 232 Ill. 2d at 281 (stating that it is the responsibility of the jury to draw reasonable inferences from basic facts to ultimate facts). As such, we find this argument to be without merit.

¶ 56     Next, we reject defendant's assertion that the lack of physical evidence created a reasonable doubt as to his guilt. Physical evidence is unnecessary to corroborate a victim's testimony. *Schott*, 145 Ill. 2d at 202-03. The testimony of a single witness, if positive and credible, is sufficient to sustain a conviction. *Siguenza-Brito*, 235 Ill. 2d at 228. We have already concluded that there is no basis for disturbing the factfinder's determination that J.K.'s testimony was credible and that there was corroborating evidence from her family members' testimony at trial. As such, the jury

could have found defendant guilty beyond a reasonable doubt despite the lack of physical evidence. See *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 89.

¶ 57    Finally, defendant contends that the State failed to prove that he held a position of trust, supervision, or authority over J.K., as is required by the statute.

¶ 58    Section 11-1.20(a)(4) does not define the terms trust, authority, and supervision. 720 ILCS 5/11-1.20(a)(4) (West 2020). However, this court has previously construed these terms in accordance with their common dictionary definitions as follows:

> " '[T]rust' is defined as '[c]onfidence in the integrity, ability, character, and truth of a person ***[;] [s]omething committed into the care of another.' [Citation.] 'Authority' is '[t]he power to command, enforce laws, exact obedience, determine, or judge.' [Citation.] 'Supervise' or 'supervision' means '[t]o direct and inspect the performance of' [citation]; the act of overseeing or inspection [citation]; to superintend or oversee [citation]." *People v. Secor*, 279 Ill. App. 3d 389, 396 (1996).

¶ 59    Further, "[t]he language of the statute does not suggest that the position of trust, authority, or supervision may result from the role of the offender alone, but that it must exist 'in relation to the victim.' " *People v. Reynolds*, 294 Ill. App. 3d 58, 66 (1997) (quoting 720 ILCS 5/12-13(a)(4) (West 1994)).

¶ 60    In the case before us, there was ample evidence in the record that would support a finding that defendant was in a position of trust and authority in relation to J.K. Her entire family had attended the same church, where defendant served as assistant pastor, for decades. Defendant attended church on Sundays, sang in the choir, taught Sunday school classes, and sometimes preached during Pastor Evans's absence. J.K. testified that she had known defendant her entire life and she trusted him. She further testified that she viewed defendant as someone she could turn to

for counseling and guidance, such as when she lost a close friend and when she was having difficulty at school. J.K.'s mother also testified that she trusted defendant, whom she had known her entire life, because he was a "man of God, we grew up together, we were in the same church." See *Secor*, 279 Ill. App. 3d at 394 (finding that the fact that the families of the defendant and the victim had been friends for 10 years likely generated mutual trust); *Wisniewski v. Diocese of Belleville*, 406 Ill. App. 3d 1119, 1128 (2011) (diocese and priests were in a position of "trust and confidence" over alleged victim where victim grew up attending church every Sunday and was taught "to respect the priests, to believe what they said was true, and to obey them").

¶ 61    This evidence suggests that defendant was a friend of the family whom J.K. trusted and respected, as she turned to him for guidance. His position as assistant pastor at the church also suggested some level of authority and trust with the attendees, especially where J.K. testified that she *often* attended his Sunday school class. See *People v. Grocesley*, 384 Ill. App. 3d 682, 687 (2008) (finding that an assistant coach is "a position of trust that our society imposes upon those who undertake to teach and mentor our children"). Such authority was further evidenced by J.K.'s testimony that she did not know how to say no to defendant's requests for sex.

¶ 62    It was within the province of the jury to determine whether defendant was in a position of trust, supervision, or authority in relation to J.K. Based on the evidence presented, it would be reasonable to conclude that defendant was in a position of trust or authority in relation to J.K. within the meaning of section 12-13(a)(4) of the Criminal Code. Therefore, there is no basis for a reversal of the guilty verdicts as to this issue.

¶ 63    Accordingly, even based on the partial record before us, we find each of defendant's contentions unavailing and conclude that the State presented sufficient evidence to prove defendant guilty beyond a reasonable doubt of two counts of criminal sexual assault.

¶ 64          B. Constitutionality of the Criminal Sexual Assault Statute

¶ 65    Defendant also argues that the trial court erred in denying his motion to dismiss the indictment based on the unconstitutionality of the criminal sexual assault statute (720 ILCS 5/11-1.20(a)(4) (West 2018)). Specifically, he contends that the statute is unconstitutional on its face because it infringes upon the fundamental privacy rights of 17-year-olds, as the age of consent in Illinois is 17 years old.

¶ 66    Before addressing the merits of this constitutional claim, we must first address the State's position that defendant lacks standing to challenge the constitutionality of the criminal sexual assault statute at issue. The State contends that defendant lacks standing because he cannot assert the rights of other individuals not before the court. Defendant cites *People v. Aguilar*, 2013 IL 112116, *modified by People v. Burns*, 2015 IL 117387, in rebuttal.

¶ 67    The purpose of the standing doctrine is "to insure that issues are raised and argued only by those parties with a real interest in the outcome of the controversy." *People v. Greco*, 204 Ill. 2d 400, 409 (2003). "Generally, a party may not raise, and a court will not consider, a constitutional challenge to a statutory provision that does not affect the party." *People v. Ashley*, 2020 IL 123989, ¶ 94. To have standing, an individual "must have sustained or be in immediate danger of sustaining a direct injury as a result of enforcement of the challenged statute." *Chicago Teachers Union, Local 1 v. Board of Education of Chicago*, 189 Ill. 2d 200, 206 (2000). The injury must be "(1) distinct and palpable; (2) fairly traceable to defendant's actions; and (3) substantially likely to be prevented or redressed by the grant of the requested relief." *Id.* at 207.

¶ 68    Here, the statute at issue was enforced against defendant and resulted in two criminal convictions and an 11-year sentence. Defendant therefore suffered a direct injury as a result of the statute's application to his alleged actions toward J.K. Significantly, because defendant has

mounted a facial challenge to the statute, rather than an as-applied challenge, we do not look at defendant's precise circumstances. In particular, defendant is arguing that this statute *itself* facially violates the fundamental right to privacy and that consequently the statute cannot be enforced against *anyone*, including defendant. See *Aquilar*, 2013 IL 112116, ¶ 12.

¶ 69    Where a statute is found to be facially unconstitutional, meaning unconstitutional in all its applications, the statute is said to be void *ab initio*. *People v. Mosley*, 2015 IL 115872, ¶ 55; *People v. Blair*, 2013 IL 114122, ¶ 28. If this court was to grant defendant the requested relief, *i.e.*, find the statute to be facially unconstitutional, defendant's injury would be redressed in that his conviction would necessarily be vacated. See *People v. Zeisler*, 125 Ill. 2d 42, 48 (1988) (noting that the doctrine of void *ab initio* declares an unconstitutional statute null and void as of the date of its enactment, "which results in the court's vacating a conviction based upon such statute"). As such, defendant has demonstrated that he sustained a direct injury from application of the criminal sexual assault statute.

¶ 70    In seeking to defeat standing, the State appears to have overlooked *Aguilar*, the landmark case that is directly applicable here. Notably, the cases that the State does cite for support were issued prior to *Aguilar*.

¶ 71    Briefly, in *Aguilar*, our supreme court determined whether the statute that defined the offense of aggravated unlawful use of a weapon was unconstitutional on its face under the second amendment of the United States Constitution. 2013 IL 112116, ¶ 22. However, before reaching the constitutional question, the court addressed whether the defendant there had standing to challenge the statute. *Id.* ¶ 12. Our supreme court first rejected the State's invocation of the principle that, "in order to have standing to contest the constitutionality of a statutory provision, the party bringing that challenge must show that he falls within the class of persons aggrieved by

the alleged unconstitutionality." *Id*. (citing *People v. Bombacino*, 51 Ill. 2d 17, 20 (1972)). The court noted that the defendant was asserting a facial challenge to the statute and held that he possessed standing because, although the conduct involved did not enjoy second amendment protection, the challenged statutes were enforced against the defendant and resulted in two felony convictions and 24 months' probation. *Id.* ¶12. To sum up its holding, the court stated that, "if [the] defendant does *not* have standing to challenge the validity of these sections, then no one does." (Emphasis in original.) *Id.*

¶ 72    Here, defendant claims that the statute is unconstitutional because it violates the fundamental privacy rights of 17-year-olds. Just as the defendant in *Aguilar* was not a member of the class of persons who would be aggrieved by the unconstitutionality because his conduct was not protected by the second amendment, defendant here is not a member of the class of persons who would be aggrieved by the alleged violation of the right to privacy. Nonetheless, those 17-year-olds whose rights are allegedly violated by the statute would never have standing to challenge the statute. This is so because the statute does not target conduct of the 17-year-olds but rather the individuals who have sexual relations with 17-year-olds and who have a position of trust, authority, or supervision. Stated another way, the 17-year-olds would never have a direct injury from application of the statute because it will never be enforced directly against them and result in a conviction. Akin to *Aguilar*, if defendant does not have standing to assert this facial challenge, then no one does. Thus, the State's assertion that defendant lacks standing is rejected.

¶ 73    We now turn to the merits of defendant's facial challenge to the constitutionality of the criminal sexual assault statute.

¶ 74    We presume the constitutionality of a statute. *In re A.C.*, 2016 IL App (1st) 153047, ¶ 27. "To overcome this presumption, the party challenging the statute must clearly establish its

invalidity." *Mosley*, 2015 IL 115872, ¶ 22. We review the constitutionality of a statute *de novo*. *Id.*

¶ 75    A facial challenge, which is presented here, is "the most difficult challenge to mount successfully." *In re M.A.*, 2015 IL 118049, ¶ 39. "To hold that a statute is facially unconstitutional means that the conduct it proscribed was beyond the power of the state to punish." *In re N.G.*, 2018 IL 121939, ¶ 36. "A statute is facially invalid only if there is no set of circumstances under which the statute would be valid." *In re M.A.*, 2015 IL 118049, ¶ 39.

¶ 76    When determining whether a statute violates due process, a reviewing court must first determine the nature of the right upon which the statute allegedly infringes. Where the right infringed upon is a fundamental right, the statute is subject to strict scrutiny analysis. *Id*. ¶ 36. "Strict scrutiny requires a showing that the statute is narrowly tailored to serve a compelling state interest." *Id.* Where a statute does not affect a fundamental right, it is subject to the rational basis test. *Id.* Under this test, a statute must only bear a rational relationship to the purpose the legislature sought to accomplish in enacting the statute, and the means adopted must be reasonable method of accomplishing the desired objective. *People v. Hollins*, 2012 IL 112754, ¶ 15. We first determine whether a fundamental right is implicated here.

¶ 77    Defendant contends that 17-year-olds have a fundamental right to privacy, which includes the right to engage in sexual intercourse with anyone over 17 years of age or older, including those who hold a position of trust, authority, and supervision in relation to them. We disagree.

¶ 78    A fundamental right is one that is "deeply rooted" in our nation's history and legal traditions. (Internal quotation marks omitted.) *People v. Avila-Briones*, 2015 IL App (1st) 132221, ¶ 72 (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). The privacy clause of the Illinois Constitution forbids unreasonable invasions of privacy. Ill. Const. 1970, art. I, § 6; *Kunkel*

*v. Walton*, 179 Ill. 2d 519, 538 (1977). "Minors, as well as adults, are protected by the Constitution and possess constitutional rights." *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 74 (1976). However, at the same time, "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults." *Prince v. Massachusetts*, 321 U.S. 158, 170 (1944).

¶ 79    The right to privacy has been held to be implicit in the fourteenth amendment's due process clause. *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978). Although the parameters of the right to privacy have not been explicitly delineated, "it is clear that among the [Court's] decisions that an individual may make without unjustified government interference are personal decisions relating to" marriage, procreation, contraception, family relationships, and child rearing and education. (Internal quotation marks omitted.) *Id.* at 385. However, this court knows of no case marking minors' decisions regarding their sexual partners to be a constitutionally protected privacy right. Instead, our courts have historically recognized that "[j]uveniles are a vulnerable population," and " '[o]ur history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults.' " *In re J.T.*, 221 Ill. 2d 338, 380 (2006) (Freeman, J., dissenting) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115-16 (1982)). Particularly " 'during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment' " expected of adults. *Hope Clinic for Women, Ltd. v. Flores*, 2013 IL 112673, ¶ 86 (quoting *Bellotti v. Baird*, 443 U.S. 622, 635 (1979) (plurality opinion)); see also *Roper v. Simmons*, 543 U.S. 551 (2005) (noting that scientific and sociological studies tend to confirm a lack of maturity and an undeveloped sense of responsibility are found in youth more than in adults).

¶ 80    Nonetheless, defendant contends that, by setting the age of consent at 17 years of age, the legislature "created a right of personal privacy or guarantee of certain areas or zones of privacy to those 17 years old and above." However, "[s]tatutes do not confer constitutional rights." *In re M.A.*, 2015 IL 118049, ¶ 68. Moreover, we would note that there is not an explicit statute stating that the age of consent is 17. Our supreme court implicitly acknowledged this in reviewing the sexual offenses statutory framework. See *People v. Lloyd*, 2013 IL 113510, ¶ 30 ("[T]he prescribed age of consent in Illinois in 17, although in a few instances where the accused is a family member or a person in a position of trust or authority, the age of consent is 18 [citation]."). Therefore, we reject this contention.

¶ 81    Defendant also argues that the United States Supreme Court in *Lawrence v. Texas*, 539 U.S. 558 (2003), upheld the right to engage in consensual sexual activity in the home without the intervention of the government. However, defendant fails to either notice or address that *Lawrence* involved consenting adults and the Court was explicitly reluctant to apply its holding to cases involving minors, injured or coerced individuals, or those who are in a relationship "where consent might not be easily refused." *Id.* at 578; see also *People v. Downins*, 357 Ill. App. 3d 193, 200 (2005) (recognizing that *Lawrence* applied only to the private, consensual activity of adults, and not to minors). Defendant cites no precedential case even suggesting that 17-year-olds have a fundamental right to have sexual relations with anyone over 18 who is in a position of trust, authority, or supervision. We certainly will not recognize that a minor has a fundamental right here where, not only is there is no history or legal tradition to support such a right, but, given our understanding of juvenile brain science, to do so would offend our sense of common decency. Because we find that no fundamental right is implicated, we apply the rational basis test to the

statute. See *People v. Reed*, 148 Ill. 2d 1, 7-8 (1992) (laws that do not infringe upon fundamental rights are subject to rational basis review).

¶ 82    Rational basis analysis gives great deference to the legislature. *People v. Pepitone*, 2018 IL 122034, ¶ 17. Where there is "any conceivable set of facts to justify the statute, it must be upheld." *Id.* Courts first must ascertain "the statute's public purpose in order to test whether its provisions reasonably implement that purpose." *Hollins*, 2012 IL 112754, ¶ 18. "[T]he court may consider arguments in support of finding a rational basis for the statute even if those arguments were not part of the original legislative discussion at the time of enactment." *Id.*

¶ 83    The legislature intentionally fixes the age of consent for certain sexual conduct in recognition of the maturity of minors, or lack thereof. *Lloyd*, 2013 IL 113510, ¶ 27. "Age of consent laws primarily serve to protect juveniles from the exploitation of older, more experienced sexual predators, and also serve to protect juveniles from themselves because they lack a sufficient understanding and appreciation of the risks and harms of intercourse." *Id.* Moreover, our supreme court and the United States Supreme Court have made clear: " 'The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance.' " *People v. Minnis*, 2016 IL 119563, ¶ 37 (quoting *New York v. Ferber*, 458 U.S. 747, 757 (1982)). Our supreme court has further recognized that children may suffer both physical and psychological injuries as a result of sexual assault and, "[b]ecause of their emotional immaturity, children are particularly vulnerable to the effects of sexual assault." *People v. Huddleston*, 212 Ill. 2d 107, 135 (2004). In regard to this particular statute, the legislature "sought to prevent sex offenses by those whom a child would tend to obey, such as a teacher or coach, as well as those in whom the child has placed his trust, such as the defendant." *Secor*, 279 Ill. App. 3d at 396.

¶ 84    Here, the statute was clearly intended to protect juveniles from sexual exploitation from those in positions of trust and power, and the statute implements that purpose by specifically criminalizing such behavior. We agree with the State's assertion that 17-year-olds are reasonably included in this particular category of sex offense because they are likely still in high school and may have jobs, which are places where sexual exploitation can often occur. See *id*. ("It is the trust that makes the child particularly vulnerable, and it is the betrayal of that trust that makes the offense particularly devastating."). We do not find anything arbitrary or unreasonable about the statute, and the statute reasonably serves the purpose of protecting minors against sexual exploitation and abuse from those in positions of power.

¶ 85    Finally, we note that defendant suggests that "trust, authority, and supervision" are "vaguely defined relationships." To the extent that defendant asserts a vagueness challenge, we must also reject that argument. A vagueness challenge to this statute has already been considered and rejected by this court in *Secor*. The court there held that the terms are "sufficiently definite to both warn defendants of the type of conduct that is prohibited and to channel the discretion of police, judges and juries." *Id*. We find no reason to depart from the holding in *Secor*. Defendant contends that *Secor* is inapplicable because it was decided before the age of consent was lowered. Defendant's argument is unpersuasive, where the age of consent is irrelevant to the vagueness of the terms in the statute.

¶ 86    Accordingly, we reject defendant's facial challenge to the constitutionality of the criminal sexual assault statute at issue here and find that the trial court properly denied defendant's motion to dismiss the indictment.

¶ 87                                C. Motion *in Limine*

¶ 88    Defendant next argues that the trial court improperly denied his motion *in limine* regarding J.K.'s alleged drug usage and treatment for an STD.

¶ 89    "A motion *in limine* is addressed to a court's inherent power to admit or exclude evidence." *People v. Zimmerman*, 2018 IL App (4th) 170695, ¶ 134. The purpose of such motions is to bring to the trial court's attention, prior to trial, evidence that is potentially irrelevant, inadmissible, or prejudicial, and to obtain a pretrial ruling on whether the evidence may be admitted or excluded. *Id.* We review a trial court's evidentiary rulings for abuse of discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010); see also *People v. Santos*, 211 Ill. 2d 395, 401 (2004) (applying this standard of review to an evidentiary ruling involving the rape shield statute). A trial court abuses its discretion when a ruling is "arbitrary, fanciful, unreasonable, or when no reasonable person would adopt the trial court's view." *People v. Ward*, 2011 IL 108690, ¶ 21.

¶ 90                                    1. Drug Usage

¶ 91    Defendant asserts that the court should have granted his motion *in limine* and permitted him to introduce evidence of J.K.'s drug usage. He argues that her drug usage is relevant to her perception of events, mental status, and ability to recollect the events. The evidence he sought to admit comprised two photographs taken from J.K.'s Facebook that, according to defendant, showed J.K. "promoting, glorifying, consuming, and in possession of Alprazolam, commonly known as Xanax."

¶ 92    The trial court, in its discretion, must decide whether evidence is relevant and admissible. *People v. Morgan*, 197 Ill. 2d 404, 455 (2001). "Evidence is considered relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of an action either more or less probable than it would be without the evidence." *Id.* at 455-56. Nonetheless, a trial court may reject evidence if it is "remote, uncertain or speculative." *Id.* at 456. "Evidence is

considered speculative if an insufficient nexus exists to connect the offered evidence to the crime." *People v. Kraybill*, 2014 IL App (1st) 120232, ¶ 41.

¶ 93 Here, the photographs defendant sought to admit show a white capsule on J.K.'s tongue. Defendant attached to his motion a Drug Enforcement Administration fact sheet regarding Xanax. In denying defendant's motion, the trial court ruled that the photographs were irrelevant, remote, uncertain, and speculative. The court also stated that the photographs show "a girl with a tongue sticking out with something on her tongue, that's all it shows."

¶ 94 We cannot conclude that the trial court's decision to bar this evidence from trial was a clear abuse of discretion. First, it is entirely uncertain and speculative whether the photographs show J.K. with a Xanax on her tongue. Even accepting that the photo was of Xanax, such does not prove that J.K. had a drug addiction or that she was under the influence of Xanax during the time of the charged incidents. There is simply no nexus between the photographs and the sexual assault. As such, the evidence defendant sought to introduce was irrelevant and, thus, inadmissible.

¶ 95 Defendant argues that the court's ruling was in contravention of his constitutional right to confront witnesses against him, including his right to conduct a reasonable cross-examination. He further cites the proposition espoused in *People v. Foster*, 322 Ill. App. 3d 780, 789 (2000), that "[p]arties must be allowed to cross-examine witnesses regarding drug use."

¶ 96 We agree with defendant that a witness's drug use can be a proper subject for cross-examination. "It is well settled that narcotics addiction has an important bearing upon the credibility of a witness, and counsel may use legitimate methods to attack the credibility of such a witness." *People v. Crisp*, 242 Ill. App. 3d 652, 659 (1992) (citing *People v. Lewis*, 25 Ill. 2d 396 (1962)); see also *People v. Armstrong*, 183 Ill. 2d 130, 146 (1998). Even so, "[t]he right to cross-examination is not absolute ***." *People v. Price*, 404 Ill. App. 3d 324, 330 (2010). " '[T]he

Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (Emphasis in original.) *People v. Kliner*, 185 Ill. 2d 81, 134 (1998) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). As such, the latitude allowed during cross-examination is likewise a matter within the sound discretion of the trial judge. *People v. Kitchen*, 159 Ill. 2d 1, 37 (1994). "A judge may limit the scope of cross-examination, and unless the defendant can show his or her inquiry is not based on a remote or uncertain theory, a court's ruling limiting the scope of examination will be affirmed." *People v. Tabb*, 374 Ill. App. 3d 680, 689 (2007).

¶ 97    In *Kliner*, 185 Ill. 2d 81 at 130, our supreme court found that the trial court did not abuse its discretion in precluding cross-examination of a witness regarding his alleged use of tranquilizers because the defendant did not provide an adequate foundation to support his claim that the witness was on tranquilizers at the time of his testimony. See also *Crisp*, 242 Ill. App. 3d at 660 (holding that the trial court properly excluded evidence of a witness's alleged drug addiction because the defendant failed to provide an adequate foundation for the line of questioning). Moreover, "where there is no evidence of addiction, the attempt to impeach a witness on that basis has been held to be 'improper unless the examiner is prepared to make a showing to support the intended questions.' " *People v. DeSavieu*, 120 Ill. App. 3d 420, 430 (1983) (quoting *People v. Brown*, 76 Ill. App. 2d 362, 373 (1966)); see also *People v. Adams*, 259 Ill. App. 3d 995, 1004 (1993) ("Before such cross-examination may be pursued, however, counsel is required to lay a proper foundation wherein he shows that the witness is a narcotics addict.").

¶ 98    Defendant did not present a sufficient foundation or showing to support a line of inquiry on cross-examination regarding J.K.'s drug usage. As stated, there was no affirmative evidence of J.K. ever having ingested illegal, nonprescription drugs, and there was no nexus between any

alleged drug use and the crimes at issue. The trial court therefore did not abuse its discretion in excluding such evidence and denying defendant's motion *in limine*, and there was no violation of defendant's constitutional right to confront witnesses against him.

¶ 99    We also find that the cases that defendant cites are distinguishable. First, in *Foster*, the witness testified to her habitual drug usage and was subject to cross-examination regarding her addiction. 322 Ill. App. 3d at 789. However, the issue on appeal in *Foster* was whether the trial court erred in denying the defendant's drug addiction jury instruction. *Id.* at 788. This court did not consider any exclusion or admission of testimony related to drug usage. As such, we find *Foster* does not support defendant's argument here. Likewise, *Armstrong* and *People v. Reed* also involved witnesses who had testified as to their drug addiction and the trial court's denial of the defendants' requests for a jury instruction on drug addiction. *Armstrong*, 183 Ill. 2d at 146-47; *People v. Reed*, 405 Ill. App. 3d 279, 288 (2010). We find these cases inapposite as well.

¶ 100   As a final aside, the case from which the proposition that parties must be allowed to cross-examine witnesses regarding drug usage originates, *People v. Strother*, 53 Ill. 2d 95, 99 (1972), is also distinguishable. There, the witness had admitted to his heroin addiction, but the defendant wanted to further question the witness as to his most recent usage of heroin and inspect the witness's arm for needle marks. The trial court rejected defendant's request for further cross-examination, and the supreme court concluded that this was an abuse of discretion because the evidence of any recent use of narcotics would affect the credibility of the witness. *Id.* In contrast, here, J.K. had not already admitted to a drug addiction, and there was no reliable evidence of any drug use.

¶ 101                              2. Rape Shield Statute

¶ 102    Defendant also asserts that the trial court erred in barring evidence showing that J.K. had been treated for an STD prior to these charges against defendant. We consider simultaneously defendant's claim that the trial court erred in allowing certain testimony in violation of the rape shield statute. Specifically, he contends that the trial court improperly allowed J.K. and Nurse Monaco to testify as to J.K.'s response to defendant's question regarding whether J.K. was sexually active.

¶ 103    Both of these issues are governed by the same standard of review set forth above and involve the rape shield statute The rape shield statute bars, in sex offense prosecutions, the admission of evidence of "the prior sexual activity or the reputation of the alleged victim." 725 ILCS 5/115-7(a) (West 2018). One of the purposes for this statute is to "prevent the defendant from harassing and humiliating the complaining witness with evidence of either her reputation for chastity or specific acts of sexual conduct with persons other than [the] defendant." (Internal quotation marks omitted.) *People v. Sandifer*, 2016 IL App (1st) 133397, ¶ 21. "Further, exclusion of such evidence keeps the jury's attention focused only on issues relevant to [sexual relations with the defendant]." (Internal quotation marks omitted.) *People v. Sandoval*, 135 Ill. 2d 159, 180 (1990).

¶ 104    The statute provides only two exceptions to this bar. Evidence of a victim's prior sexual history may be admissible where (1) consent is an issue and the defendant seeks to introduce prior sexual activity between himself and the victim (consent) or (2) the evidence is constitutionally required to be admitted (constitutionally required). 725 ILCS 5/115-7(a) (West 2018); *Santos*, 211 Ill. 2d at 402.

¶ 105    Further, and as relevant here, "even when admissible under the rape shield statute, the determination of whether the details of the sexual activity were admissible remain[s] subject to the

standards of relevancy." (Internal quotation marks omitted.) *Sandifer*, 2016 IL App (1st) 133397, ¶ 29. The exception for evidence that is constitutionally required allows a defendant to enter evidence that is directly relevant to matters at issue in his case and "would make a meaningful contribution to the fact-finding enterprise." (Internal quotation marks omitted.) *Id.* ¶ 32.

¶ 106   We first turn to defendant's assertion that the trial court abused its discretion in excluding evidence that J.K. was treated for an STD a year prior to these allegations. He claims that this evidence was offered for the purpose of impeaching J.K. The State responds that the evidence of J.K.'s treatment for an STD was properly excluded as it was irrelevant and did nothing to disprove the allegations against defendant. The State argues that this court should also reject defendant's argument that evidence of an STD is not evidence of sexual activity and therefore does not fall within the purview of the rape shield statute. We agree with the State.

¶ 107   Preliminarily, we note defendant's assertion that J.K. admitted to being sexually active and being treated for an STD in a video recorded interview with the police. However, defendant cites no portion of the record to support this statement, and this court's review of the record does not reveal any support either. As such, we will give neither credence nor consideration to unsupported allegations of a recorded admission in reviewing defendant's claim.

¶ 108   We first address *People v. Grano*, 286 Ill. App. 3d 278, 288 (1996), which defendant cites for the proposition that verbal accusations do not constitute sexual activity within the meaning of the rape shield statute. In *Grano*, the defendant argued that the trial court improperly barred evidence that the victim had made prior allegations of sexual activity with other men but that such activity in fact never occurred. *Id.* at 287. In construing the rape shield statute, this court stated that "the legislature intended to exclude the *actual sexual history* of the complainant, not *prior accusations* of the complainant." (Emphasis in original.) *Id.* at 288. The court continued, stating

that "[l]anguage or conversation does not constitute sexual activity." *Id.* In conclusion, the court held that the defendant "should have been allowed to introduce the evidence in order to attack the credibility of the complainant." *Id.*

¶ 109    Significantly, our supreme court in *Santos* explicitly rejected this court's holding in *Grano*. In assigning error, our supreme court expressed its disagreement that the trial court misapplied the rape shield statute as a basis for excluding the evidence of the victim's inconsistent statements. *Santos*, 211 Ill. 2d at 402-03. At issue in *Santos* was whether the trial court properly barred the defendant from cross-examining the victim about her inconsistent statements regarding whether she had engaged in sexual activities with anyone else during the 72 hours preceding the sexual assault. *Id.* at 401. The supreme court found that, although the evidence at issue was merely the victim's statements, those statements revealed the victim's sexual activity and thus the rape shield statute was invoked. *Id.* at 402-03. The court continued that "the statute makes no exception based on the purpose for which the evidence is offered." *Id.* at 403.

¶ 110    *Santos* is directly applicable here where defendant sought the admission of evidence of J.K.'s prior sexual activity, *i.e.*, prior treatment for an STD, for purposes of impeachment. This evidence was not outside the purview of the rape shield statute simply because it was offered to impeach J.K.'s credibility, where there was testimony that she informed defendant that she was not sexually active. See 725 ILCS 5/115-7(a)(1) (West 2020).

¶ 111    We next consider whether the proffered evidence falls within either of the two exceptions. As to the first exception (consent), we find that it does not apply because the evidence of sexual activity was not related to prior sexual relations between J.K. and defendant.

¶ 112    As to the second exception (constitutionally required) (see 725 ILCS 5/115-7(a)(2) (West 2020)), we are again guided by our supreme court's decision in *Santos*. The supreme court held

that there was "no constitutional necessity for the impeachment," which consisted of "two out-of-court statements which were inconsistent with each other, but not with any statement made by the witness on direct examination." *Santos*, 211 Ill. 2d at 403-08; see also *Sandoval*, 135 Ill. 2d at 176-81 (concluding that the defendant was not entitled to present evidence rebutting the victim's direct testimony that she had never had anal sex with a man other than defendant because it was irrelevant and had no impact on the issue of consent). The court in *Santos* proceeded to construe the impeachment evidence as collateral and as "specific-act impeachment," which the court noted is prohibited in Illinois. *Santos*, 211 Ill. 2d at 404 (citing cases barring cross-examination regarding specific instances of untruthfulness because it is overly prejudicial in relation to its probative value).

¶ 113    Here, we are faced with evidence of treatment for an STD, which was inconsistent with an out-of-court statement to defendant that J.K. was not sexually active. Defendant did not seek to contradict any in-court statement made by J.K. on direct examination, only a statement made to defendant just prior to the first sexual assault. Consistent with *Santos*, this evidence constitutes collateral and specific-act impeachment. Additionally, we find that this evidence is not directly related to the offenses involved and would potentially distract the jury from the issues at hand. See *People v. Bates*, 2018 IL App (4th) 160255, ¶ 59 (evidence that is "marginally relevant or which poses an undue risk of harassment, prejudice, or confusion of the issues" is not constitutionally required to be admitted). Accordingly, the trial court did not abuse its discretion in barring defendant from introducing evidence of J.K.'s prior STD treatment. See also *People v. Lewis*, 2017 IL App (1st) 150070, ¶ 24 (citing cases and noting that the trial court's decision to exclude STD test results was "in line with the great weight of authority from our jurisdiction and others regarding the introduction of evidence of [an STD] under various rape shield statutes").

¶ 114 We next address defendant's claim that the trial court abused its discretion in allowing the State to elicit the statement from J.K. and Nurse Monaco that J.K. had told defendant that she was not sexually active because the testimony violated the rape shield statute. In response, the State asserts that the admission of this conversation was not offered for the truth of the matter asserted and did not violate the rape shield statute. We agree.

¶ 115 Here, the State elicited testimony from J.K. regarding the events and communication leading up to the instances of sexual assault. J.K. testified that she spoke with defendant, via her cell phone, and he asked her if she was sexually active. She responded that she was not, and he stated that he would "teach" her. Similarly, Nurse Monaco testified that her patient history for J.K. indicated that J.K. relayed this same conversation to her.

¶ 116 We find *People v. Harris*, which the State cited, analogous here. 297 Ill. App. 3d 1073 (1998). There, both victims testified that, prior to the sexual assault, the defendant asked them whether they were virgins, to which they each replied, " 'yes.' " *Id.* at 1088. This court found that this was not evidence of the victims' past sexual activity, particularly where they were not asked whether they had told defendant the truth. *Id.* The court further stated that the evidence was offered to show the circumstances of the assault as well as the motivations of the defendant. *Id.* at 1088-89.

¶ 117 Likewise, in this case, the testimony did not put into evidence J.K.'s prior sexual activity where she responded "no" to defendant's question, and she was not questioned on the veracity of her response. As such, the rape shield statute was not implicated through this testimony nor through the State's reference to this testimony during closing argument.

¶ 118 Rather, the evidence was elicited for the purpose of understanding the circumstances and communications leading up to the sexual assault. It also revealed defendant's motivations and state

of mind just prior to the first sexual assault where he expressed that he wanted to teach J.K. about sex. Nurse Monaco's testimony bolstered J.K.'s credibility by showing that J.K. relayed the same conversation to other individuals. These are all relevant purposes for the admission of this evidence. As such, we do not find that the trial court abused its discretion in allowing this testimony at trial and for its use during the State's closing argument.

¶ 119        D. Motions for a Directed Verdict and for Judgment Notwithstanding the Verdict

¶ 120   Next, defendant argues that the trial court erred in denying his motions for a directed verdict and for judgment notwithstanding the verdict (JNOV). Specifically, he contends that no reasonable mind could fairly conclude defendant's guilt where it was impossible for him to have committed the sexual assault alleged in count I because J.K. was out of town on April 20, 2018. He also contends that, due to the lack of corroborating evidence and the extreme credibility issues, no reasonable mind could fairly conclude defendant's guilt in regard to count II because the evidence suffered from extreme credibility issues.

¶ 121   "A motion for a directed verdict asserts only that as a matter of law the evidence is insufficient to support a finding or verdict of guilty." *People v. Withers*, 87 Ill. 2d 224, 230 (1981). As such, we review the trial court's denial of the motion for a directed verdict *de novo*. *People v. Ward*, 2021 IL App (2d) 190243, ¶ 46. A trial court's ruling on a motion for JNOV is also subject to *de novo* review. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37.

¶ 122   We first address the motion for JNOV. Nowhere in the transcript, common-law record, nor supplemental record do we find such a motion. The citations of the record in both defendant's and the State's briefs do not point us to a specific motion for JNOV or the court's ruling on such a motion. There is a brief mention in defendant's "post-trial motions" that "the judgment must be vacated despite the jury's verdict in that it is not supported by competent evidence or otherwise

Defendant must be given a new trial." Notably, that motion states that it is presented pursuant to section 116-1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-1 (West 2020)), which specifically provides for a motion for a new trial and not a motion for JNOV. Despite similarities between these motions, they are distinct and cannot be simply lumped together. As an express motion for JNOV was not made before the trial court, there is nothing for this court to review.

¶ 123   In regard to the motion for directed verdict, the State contends that defendant has forfeited that claim of error for failure to renew his motion at the close of all evidence. It is well settled that a defendant who chooses to present evidence after the denial of his motion for a directed verdict at the close of the State's case waives any error in the trial court's ruling on the motion unless he renews the motion at the close of all the evidence. *People v. Cazacu*, 373 Ill. App. 3d 465, 473 (2007); see also *People v. Washington*, 23 Ill. 2d 546, 548 (1962) (applying the waiver rule from civil cases to criminal cases).

¶ 124   Defendant asserts that, pursuant to *People v. Kelley*, 338 Ill. App. 3d 273, 277 (2003), he had effectively renewed his motion for a directed verdict because he referred "to factual arguments made in support of the original motion" during his closing argument. We disagree and find the circumstances before us distinguishable from those in *Kelley*. There, during a bench trial, the defendant filed two written motions for a directed verdict at the close of the State's case-in-chief, and after the defense presented evidence, defense counsel orally moved for a directed verdict. *Id.* Accordingly, this court concluded that defense counsel's "brief oral argument adequately renewed the motions to preserve the issues on appeal." *Id.*

¶ 125   Here, defendant may have made arguments during his closing argument similar to those made in his motion for a directed verdict, but at no point did he expressly refer to that motion, nor

did the trial court ever acknowledge a renewal of that motion. As such, *Kelley* is inapplicable, and we deem the claimed error forfeited.

¶ 126   Forfeiture aside, we have already rejected defendant's arguments and concluded that the State presented sufficient evidence for a rational trier of fact to find defendant guilty beyond a reasonable doubt of criminal sexual assault, as to both dates. As such, defendant's arguments in regard to these two motions fail.

¶ 127                               E. Motion for a New Trial

¶ 128   Defendant also argues that the trial court erred in denying his motion for a new trial. He specifically contends that the jury's verdict was not supported by the evidence and several of his rights were violated because of the court's denial of his motion *in limine* and the admission of evidence in violation of the rape shield statute during the State's case-in-chief and closing argument. Notably, defendant's written motion for a new trial does not contain any reference to the State's violation of the rape shield statute. Rather, the motion objects to the State's closing argument where the State referenced J.K.'s testimony that the clothing she had been wearing on the two occasions had been washed by the time the police became involved. In any case, we do not find that the trial court erred in denying defendant's motion for a new trial.

¶ 129   Following a verdict or finding of guilt, a court may grant a defendant a new trial, and the motion for a new trial "shall specify the grounds therefor." 725 ILCS 5/116-1(a), (c) (West 2020). Whether to grant a motion for a new trial is within the sound discretion of the trial court, and a reviewing court will not disturb that decision absent a clear abuse of discretion. *People v. Gibson*, 304 Ill. App. 3d 923, 930 (1999). To make that determination, " 'the reviewing court will consider whether the jury's verdict was supported by the evidence and whether the losing party was denied

a fair trial.' " *People v. Dixon*, 256 Ill. App. 3d 771, 778 (1993) (quoting *Reidelberger v. Highland Body Shop, Inc.*, 83 Ill. 2d 545, 549 (1981)).

¶ 130   We have previously addressed each of these contentions and found no error as to any of them. Moreover, we have determined that the evidence presented at trial was sufficient to prove defendant guilty beyond a reasonable doubt of both counts of criminal sexual assault. Finally, as stated, two of defendant's contentions, that the admission of evidence during the State's case-in-chief and closing argument violated the rape shield statute, were not included in his motion for a new trial, and thus, we will not consider them here. See *People v. Estrada*, 394 Ill. App. 3d 611, 626 (2009) ("It is axiomatic that arguments may not be raised for the first time on appeal."). As such, we find that the trial court did not abuse its discretion in denying defendant's motion for a new trial.

¶ 131                                    F. Plain Error

¶ 132   As to any unpreserved claims of error, defendant requests that this court review those claims under the plain error doctrine. Specifically, defendant contends that the trial court's errors in denying his motions *in limine* and allowing the State to introduce evidence in violation of the rape shield statute during its case-in-chief and closing argument constituted plain error and thus his convictions must be reversed and remanded for further proceedings. Additionally, in his reply brief, defendant asserts that the trial court's denial of his motion for a directed verdict was plain error.

¶ 133   Under the plain error doctrine, it is well established that "a reviewing court may consider an unpreserved error if (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it

affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Birge*, 2021 IL 125644, ¶ 24 (citing *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007)). "Under either prong, the defendant bears the burden of persuasion." *Id.* The first step in any plain error analysis is to determine if an error actually occurred. *Piatkowski*, 225 Ill. 2d at 565.

¶ 134   As we have previously concluded, the court did not err in regard to any of defendant's contentions. For that reason, to the extent that any of these claims were not preserved, we find that there has been no plain error and this argument is without merit.

¶ 135                          G. Presentencing Custody Credit

¶ 136   Finally, defendant contends that he is entitled to 602 days of presentencing custody credit for the time he spent on EHM. He argues that there was a change in the law while this matter was pending on appeal, and that change should be applied here.

¶ 137   According to defendant, he spent a total of 602 days on EHM. He requested that the trial court include those 602 days in his custody credit; however, the court denied defendant's request due to a restriction on granting such credit to defendants who have been convicted of criminal sexual assault.[5] While his appeal was pending, the legislature amended section 5-4.5-100 of the Unified Code of Corrections (Code of Corrections) (Pub. Act 101-652, § 10-281 (eff. July 1, 2021) (amending 730 ILCS 5/5-4.5-100)), which provides for the calculation of sentencing credit.

---

[5]As explained in the background section, the trial court discovered when considering defendant's post sentencing motion that, pursuant to section 5-4.5-100(d) of the Code of Corrections (730 ILCS 5/5-4.5-100(d) (West 2020)), defendant should not have been given any custody credit for time spent on EHM because he was found guilty of criminal sexual assault. Nonetheless, after noting its error, the court did not retract the previously awarded 338 days of credit.

¶ 138    At the time defendant was sentenced, the statute mandated: "An offender sentenced to a term of imprisonment for an offense listed in paragraph (2) of subsection (c) of Section 5-5-3 *** shall not receive credit for time spent in home detention." 730 ILCS 5/5-4.5-100(d) (West 2020). Criminal sexual assault is one of the offenses listed.

¶ 139    The amendment to section 5-4.5-100, which became effective on July 21, 2021 (Pub. Act 101-652, § 10-281 (eff. July 1, 2021) (amending 730 ILCS 5/5-4.5-100)), removed the restriction from granting credit to a defendant for time spent in home detention based on one of the listed offenses, including criminal sexual assault. *Id.*

¶ 140    Clearly, there was no trial court error where the trial court applied the relevant statute at the time of defendant's sentencing. Rather, defendant now requests that the 2021 amendment be applied retroactively and that this court grant him additional custody credit, essentially for the entire duration that he was on EHM. The State argues that defendant is not entitled to additional sentencing credit where the amendment is substantive and can only be applied prospectively.

¶ 141    The issue before us then is one of statutory construction, specifically determining whether the amendment should be applied retroactively.

¶ 142    The court's "primary objective when construing the meaning of a statute is to ascertain and give effect to the intent of the legislature." *People v. Williams*, 239 Ill. 2d 503, 506 (2011). Where the language of the statute is clear and unambiguous, the statute should be applied without any further aids of statutory construction. *Id.* Additionally, courts may not read into the statute limitations, exceptions, or other conditions not expressed by the legislature. *People v. Glisson*, 202 Ill. 2d 499, 505 (2002). "The court should evaluate the statute as a whole rather than reading phrases in isolation," and no part of the statute should be rendered superfluous. *Id.* Lastly, courts

may assume that "the legislature did not intend absurdity, inconvenience or injustice to result from legislation." *Id.*

¶ 143    Illinois courts utilize a retroactivity analysis that couples the procedure set forth in the United States Supreme Court's *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), with section 4 of our legislature's Statute on Statutes (5 ILCS 70/4 (West 2020)), which is a general savings clause providing instruction on the temporal reach of statutory amendments. *Caveney v. Bower*, 207 Ill. 2d 82, 92 (2003); see also *People v. Hunter*, 2017 IL 121306, ¶ 36 ("[O]ur retroactivity jurisprudence, though flowing from *Landgraf*, was tempered by our construction of section 4 of the Statute on Statutes ***.").

¶ 144    Under *Landgraf*, we first determine whether the legislature has "expressly prescribed" the statute's temporal reach. 511 U.S. at 280. If the legislature has included such language, the legislature's intent will be given effect. *People ex rel. Alvarez v. Howard*, 2016 IL 120729, ¶ 19. If the temporal reach of the statute is not clearly indicated in the text of the statute, then we look to section 4. *Hunter*, 2017 IL 121306, ¶ 22. Our supreme court has interpreted section 4 to mean that procedural changes to statutes will be applied retroactively, whereas substantive changes are prospective only. *Howard*, 2016 IL 120729, ¶ 20.

¶ 145    Our review of the statutory amendment to section 5-4.5-100 does not reveal any language suggestive of a specific temporal reach for the changes. We presume that the legislature adopted this amendment with knowledge of section 4 and this court's interpretation thereof. *Hunter*, 2017 IL 121306, ¶ 36. As such, the statute's temporal reach is provided by default according to section 4 of the Statute on Statutes. See *Howard*, 2016 IL 120729, ¶ 20.

¶ 146    The next step in the retroactivity analysis pursuant to section 4 is to determine whether the statutory amendment effected a procedural or substantive change in the law. However, we need

not decide that issue because the second sentence of section 4 controls our result here. See *Hunter*, 2017 IL 121306, ¶ 52 (bypassing the second step where the statutory amendment mitigated punishment and therefore was subject to the second sentence of section 4). That sentence provides: "If any penalty, forfeiture or punishment be mitigated by any provisions of a new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect." 5 ILCS 70/4 (West 2020). Our supreme court has interpreted this to mean that "a punishment mitigated by a new law is applicable only to judgments after the new law takes effect." *People v. Hansen*, 28 Ill. 2d 322, 341 (1963).

¶ 147 Here, the statutory amendment to section 5-4.5-100 has a mitigating effect on the punishment for defendants imprisoned for criminal sexual assault by allowing for custody credit for time spent on home detention, including EHM, where they previously could not receive such credit. As such, because defendant was sentenced before the amendment became effective, the amendment is not applicable, and defendant is not entitled to additional sentencing credit.[6] See *People v. Bradford*, 106 Ill. 2d 492 (1985) (holding that the defendant was not eligible to be sentenced under a statutory amendment that became effective while his appeal was pending).

¶ 148                                    III. CONCLUSION

¶ 149 For the reasons stated, we affirm the judgment of the circuit court.

¶ 150 Affirmed.

---

[6]As a final aside, we reject defendant's reliance on *People v. Othman*, 2019 IL App (1st) 150823, ¶¶ 88-89, in which this court determined that a change to the sentencing procedures for juveniles was procedural and thus retroactive. Our supreme court issued a supervisory order in that appeal instructing this court to vacate portions of the order ruling on the constitutionality of the defendant's sentence. This court vacated that order and issued *People v. Othman*, 2020 IL App (1st) 150823-B, which no longer contains the portions to which defendant cited for support.

*People v. Carter*, 2022 IL App (1st) 210261

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CR-8763; the Hon. Stanley J. Sacks, Judge, presiding. |
| **Attorneys for Appellant:** | Ilia Usharovich and Sheldon Sorosky, both of Wheeling, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Mary L. Boland, and Lisanne P. Pugliese, Assistant State's Attorneys, of counsel), for the People. |