NOTICE
Decision filed 11/21/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230707-U

NO. 5-23-0707

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Marion County. |
| | ) | |
| v. | ) | No. 21-CF-275 |
| | ) | |
| DEVON Q. GIBBS, | ) | Honorable |
| | ) | Mark W. Stedelin, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Vaughan and Hackett* concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm defendant's convictions where the State's evidence was sufficient to prove defendant guilty of four counts of predatory criminal sexual assault of a child, the trial court did not commit reversible error or abuse its discretion by admitting the minor child's video-recorded interview into evidence, and defendant failed to establish a claim of ineffective assistance of counsel.

¶ 2   Following a bench trial in the circuit court of Marion County, defendant, Devon Q. Gibbs, was convicted of four counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40 (West 2020)). Defendant appeals, arguing that (1) the State's evidence was insufficient to convict him on all four counts, (2) the trial court erred by admitting the minor child's video-recorded

_____

*Justice Welch was originally assigned to the panel prior to his death. Justice Hackett was later substituted on the panel and has read the briefs and listened to the recording of oral argument.

1

interview into evidence at trial, and (3) he received ineffective assistance of counsel. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On August 30, 2021, the State charged defendant by amended information with nine counts of predatory criminal sexual assault of a child (*id.* § 11-1.40(a)(1)). Relevant here,[1] the State alleged that between January 1, 2020, and August 14, 2021, defendant, a person over the age of 17 years, committed acts of sexual penetration with K.C., a child under the age of 13, by placing his finger in the vagina of K.C. (count III), placing his penis in the vagina of K.C. (count IV), placing his mouth on the vagina of K.C. (count V), and placing his penis in the mouth of K.C. (count VI).

¶ 5      On November 23, 2022, the State filed a motion to admit testimony pursuant to the hearsay exception set forth in section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2020)). The State alleged, *inter alia*, that K.C., who was six to eight years old at the time of the alleged offenses, made several disclosures regarding the charges against defendant during a recorded interview with Wendi Zobrist at the Amy Schulz Child Advocacy Center (Amy Center) on August 17, 2021. Specifically, K.C. disclosed that defendant put his finger inside of her vagina, put his penis inside of her vagina, put his mouth on her vagina, and put his penis inside of her mouth. In addition to Zobrist's testimony regarding the interview, the State sought to admit the video-recorded interview into evidence at defendant's trial.

¶ 6      On February 22, 2023, the trial court addressed the State's motion at a hearing. The State indicated that defense counsel had no objection to the State's motion and defense counsel responded, as follows: "That's correct. I'm kind of concerned; however, the expansion [of] the

_____

[1]Defendant's arguments on appeal do not pertain to the remaining counts, which were predicated on his alleged acts with other minor children.

2

hearsay rule in this case with her. And I would like to go through, if you don't mind, I'd like to go through the motion to admit hearsay. Do you have it in front of you, Your Honor?" Defense counsel asserted that "[a]ny evidence given to Wendi Zobrist concerning sexual predatory would be admissible, as long as it's more specific than set forth in [the State's motion]." Defense counsel asserted that the State's allegations were "sort of generic." The State clarified its intention to introduce the video recording of the interview, as well as Zobrist's testimony regarding the interview. The State indicated that Zobrist's testimony would "be more specific." Defendant subsequently waived his right to a jury trial.

¶ 7      On June 15, 2023, the matter proceeded to a bench trial. When the trial court asked if the parties were prepared to proceed, the State responded, "Well, I thought that all motions regarding hearsay/closed circuit were ruled upon, and I'm now being told we need to possibly have another hearing on something." The State confirmed that the court previously ruled on the motion to admit hearsay. Defense counsel stated that he did not believe he "stipulated to anything." Defense counsel, citing "*People* [*v.*] *Johnson*," then stated:

> "It's a very simple thing with a bench trial. He can present what he's going to, what the young lady is going to say, and you can judge it on the basis of—it says one of the requirements of admitting a child's out of court accusations of sexual assault is that the time, [content] and circumstances in the statement provides sufficient safeguards. And then it cites evaluating the reliability of the statement of the court should consider the totality of the circumstances. *People* [*v.*] *Lara*. Relative factors include a child's spontaneity and consistent repetition of the incident.
>
> Two, the child's mental state. Three, the use of terminology unexpected of the child of similar age, and, four, the lack of motive to fabricate. These are all cited in *Lara*, L-A-

3

R-A, 2011 Illinois Appellate 480983B. So I'm suggesting that before that the Court observe this tape and/or video and make that determination before it's placed in. Now, the problem with the video is that most of the testimony is coming from Ms. Zobrist or Wendi."

Defense counsel went on to state, "There you are to judge whether or not there is that much testimony coming from the little girl and whether the little girl is, as it says in the *Lara* case, competent to testify since she's a minor. And, otherwise, I'm hooked in to being a *Strickland* candidate." When the court stated that "we're doing this as a bench trial," defense counsel responded, "I don't think that would relax the standard." The court stated, "It doesn't relax the standard, but it changes when I need to hear the motion, doesn't it, in I can hear it when it's offered?" After reviewing the motion and its prior docket entry indicating that the motion was granted without objection, the court stated, "Now, that I believe is the ruling that controls us at this point in time." After acknowledging defense counsel's argument that Zobrist asked leading questions during the interview, the court clarified that it had not "seen the interview at all, and didn't need to see the interview because it became admissible by stipulation." The court explained that defense counsel's objection regarding leading questions "would go to the weight of the interview and the testimony." The court indicated that it would view the video recording during trial, allow defense counsel to renew his objection, and disregard the contents of the video if it agreed with counsel's objection.

¶ 8    The State then called Christy Johnston, K.C.'s mother, as its first witness. Johnston testified that K.C. was 10 years old at the time of trial. K.C. did not live with Johnston at the time of trial but previously lived with her at a two-story home in Salem, Illinois, in the summer of 2021. Defendant, Johnston's ex-husband, also lived with Johnston and K.C. at that time. Johnston was in a relationship with defendant for approximately one year. K.C. referred to defendant as "Devon"

4

or "dad." There were times when K.C. was alone at the home with defendant. Johnston became concerned about K.C.'s relationship with defendant in August 2021, so Johnston did not allow defendant back into the home after that time. In August 2021, Johnston collected a shirt that belonged to K.C. with the saying "girls power/girls rule" and provided it to police for testing.

¶ 9 On cross-examination, Johnston testified that she had nine children with five different men. All of Johnston's children were placed in foster care at the time of trial. When Johnston and defendant lived together, they had sex three or four times each week. Johnston confirmed that defendant had "a very large penis" and that she had difficulty having sex with him. Johnston agreed that she bled and felt sore after having sex with defendant. Johnston further agreed that she directed defendant to stop having sex with her multiple times due to the pain she experienced. Johnston agreed that defendant occasionally wiped his ejaculate on nearby clothing and that her sheets may have been stained with ejaculate. Johnston did not know when her daughter wore the "girls power/girls rule" shirt she provided to police and agreed the shirt could have been in Johnston's bedroom at a time when she and defendant had sex. While questioning Johnston on cross-examination, defense counsel submitted into evidence a medical record from an examination of K.C. that occurred on August 17, 2021. The medical record stated, "Hymen intact, normal rectal tone, no physical evidence of trauma."

¶ 10 Trent Swagler, a detective at the Salem Police Department, testified that he received clothing and sheets from Johnston on August 18, 2021. He packaged the items and placed them in the evidence vault. Detective Swagler interviewed defendant on August 26, 2021. During the interview, defendant stated that K.C. was his stepchild and that the two "were close." Detective Swagler obtained a DNA sample from defendant during the interview.

¶ 11 The State next called Zobrist, who testified that she interviewed K.C. on August 18, 2021. Zobrist was a forensic interviewer and executive director at the Amy Center at the time of the interview. As a forensic interviewer, Zobrist conducted "victim sensitive interviews on children who [were] involved in either a criminal or DCFS investigation." Zobrist worked as a forensic interviewer for six years and received training for this position through the Children's Advocacy Center of Illinois. Zobrist also received a certification as a forensic interviewer and continued with training by attending various peer reviews with other forensic interviewers. Zobrist additionally "trained with Homeland Security, forensic interview through Homeland Security, FBI, and Illinois State Police." Zobrist testified that she was trained "to ask open-ended questions." Zobrist occasionally asked "closed-ended questions if need be." Zobrist did not attempt to lead or coach the child during the interview.

¶ 12 Zobrist conducted a recorded interview with K.C., which lasted "around 55 minutes." During the interview, K.C. referred to defendant as her "stepdad" and "Devon." K.C. advised Zobrist that defendant no longer lived in her home "because her mommy didn't like him anymore." When asked if K.C. disclosed incidents of sexual acts between herself and Devon, Zobrist responded, "Yes." The following colloquy then took place between defense counsel, the State, and the trial court:

"[DEFENSE COUNSEL]: I'm going to enter my objection to the whole of this on the basis of the hearsay, of the 115/10 hearsay situation based on the fact that she is going to give narratives of the child and the child is going to testify. But I don't think that we have made an assessment of the child's testimony based on the *Johnson* case.

[THE STATE]: Judge, I believe relevant factors are the time, circumstances, and manner of the hearsay statement that is sought to be admitted bearing some indicia of

6

reliability. We have a trained child forensic interviewer saying the steps that she's taken, the training that she's had, the type of interview that she's conducting, that she asked open-ended questions to the extent that she can. And this Court has previously ruled, I think, on February the 22nd that the contents of Paragraph 11 in the State's motion to admit hearsay were going to be admitted.

THE COURT: I'm going to note the objection. I'll show it as a standing objection. And we may discuss the objection after I have a chance to—after the examination of this witness and the content of the video.

The Court previously ruled on the motion to admit hearsay, that was admitted without objection. Or was granted without objection. I'm noting on 115/10 that the Court is to conduct the hearing outside the jury. Obviously we don't have that problem. We have to find that there was sufficient safeguards of reliability that it was a child and the child testifies at the proceedings.

So, barring that, I'll hear the testimony. I may strike it after we conclude, but we'll deal with that then. You may proceed. We'll note it as a standing objection."

¶ 13    The State then resumed its direct examination of Zobrist. When asked if K.C. described the sexual incidents involving defendant in age-appropriate terms, Zobrist responded, "Yes." When discussing the sexual incidents, K.C. "became very upset." Zobrist explained that K.C. "got very quiet. She hid her face behind a notebook and mentioned to [Zobrist] several times that she was nervous and scared. And at one point she started to cry."

¶ 14    Zobrist next identified a disc containing the recorded interview of K.C. as State's Exhibit No. 1. Zobrist testified that she previously reviewed the contents of the disc and confirmed that it was an exact recording of her interview with K.C. without any edits or alterations. The State moved

7

to publish the recording of the interview, and the trial court granted the State's request but noted defense counsel's continuing objection.

¶ 15    Zobrist testified that, during the interview, she showed K.C. body charts. Zobrist identified the body charts as State's Exhibit Nos. 2A and 2B. The body charts displayed both the male and female bodies. Zobrist testified that she circled places on the body chart and wrote words next to the circles. The body chart of the female, State's Exhibit 2A, displayed circles on the areas depicting the female vaginal and rectal area. Zobrist wrote "no-no square" next to the circle of the vaginal area, explaining that K.C. described her vaginal area as a "no-no square" during the interview. Zobrist wrote "bottom" next to the circle of the rectal area, explaining that K.C. described her rectal area as a "bottom" during the interview. The body chart of the male, State's Exhibit 2B, displayed a circle on the area depicting the penis. Zobrist wrote "wee wee" next to the circle of the penis area, explaining that K.C. used that word to describe a penis during the interview.

¶ 16    On cross-examination, Zobrist confirmed that K.C. advised during the interview that she kicked defendant "in the nuts." When asked what K.C. meant when she used the word "nuts," Zobrist responded, "I did not follow-up. She was just sharing a story about her defending herself, so I did not follow-up by nuts." Zobrist confirmed that she did not know where K.C. learned the word "nuts."

¶ 17    Following cross-examination, the State moved to admit State's Exhibit Nos. 1, 2A, and 2B. Defense counsel objected "on the same line of objection." The trial court admitted the exhibits over defense counsel's objection.

¶ 18    At the conclusion of Zobrist's testimony, the recorded interview was played for the trial court. In the recorded interview, K.C. advised Zobrist that her mother directed her to tell Zobrist

8

"what [she] said last time." K.C. was aware she would be interviewed about an incident involving defendant. K.C. referred to defendant as her stepdad and Devon in the interview. K.C. advised that the first incident involving defendant occurred on her last day of school the previous school year. When Zobrist asked K.C. what she was doing before the incident occurred with defendant, K.C. responded, "So all I did was after I used to live with Sherri, I came back and then he just started doing it to me." K.C. elaborated, "First when I went to my old school, and it was the last day, my meemaw picked me up and then dropped me off. And she was there too and then the first day he started it." K.C. was unable to recall the specific date due to the lapse of time. K.C. explained that her "meemaw" was home when the incident occurred but that her meemaw was "drunk and asleep" on the couch. K.C. advised that defendant "just started putting his hands in her pants" and "digging into [her] no no square" when she came home. K.C. used the term "no no square" to describe her vagina. K.C. further advised that her sister was home watching defendant's phone in the front room. K.C. was in her mother's bedroom playing a game with defendant when defendant "just started doing it." K.C. claimed defendant stopped when she "kicked him in the nuts."

¶ 19    K.C. then asked Zobrist if the interview was "almost done." Zobrist stated that it was "getting close" and asked K.C. if "anything else ever happened with [defendant] at a different time." K.C. then stated that defendant "always used to put his wee wee inside of [her]" and "always made [her] suck on it." When Zobrist asked K.C. to describe a time when defendant put his penis inside of her, K.C. stated that she was playing a game when defendant asked her to come help him with something in the kitchen. While K.C. could not recall the specific date this occurred, she recalled that defendant put her on the kitchen counter and took off her pants and underwear. K.C. advised that defendant then began digging into her "no no square" and put his tongue into it. K.C. attempted to kick defendant in the face but he backed away. Defendant began licking her ear and

9

neck and kissing her. K.C. bit defendant's lip, and defendant stated, "Oh, we're finished." K.C. understood this to mean that she would go back to playing her game. When Zobrist asked K.C. if something else happened with defendant, K.C. stated that she returned to play the game. Zobrist asked K.C. if the incident on the kitchen counter was a time where defendant put his "wee wee" inside of her, and K.C. responded, "Mm hmm." Zobrist then asked K.C. to talk about defendant putting his penis inside of her. K.C. then stated, "Well, he always told me to go fast or slow and I always said fast so we can get it over with 'cause I don't want to do that. I'm too young." When Zobrist asked K.C. to elaborate, K.C. indicated that she needed to think about it for a minute. K.C. then stated that she did not know how to explain it. K.C. stated that the incident on the kitchen counter ended when she "slid off under [defendant] and he didn't know." According to K.C., defendant believed K.C. "was still on the counter" but she was not there when he opened his eyes. K.C. stated that she ran into her mother's room but could not call her mother because defendant had the phone. Zobrist next asked K.C. if anything came out of defendant's penis during the kitchen incident. K.C. responded, "Yeah, mom said it was a nut." K.C. elaborated, "Nut is like that gooey stuff that, like, comes out of him and tries to get people pregnant."

¶ 20    Zobrist next asked K.C. how her mother found out about the incident with defendant. K.C. explained that, the day before the interview, her mother asked if defendant touched her "in the wrong spot." K.C. initially lied to her mother but then admitted that defendant did touch her. K.C. stated that she told her mother the same things that she told Zobrist.

¶ 21    Zobrist resumed questioning K.C. regarding "the nut." When Zobrist asked K.C. to describe what "the nut" looked like and where it went after it came out of defendant's penis, K.C. stated that "the nut" was white and he wiped it off on bed sheets. K.C. denied that "the nut" came

out of defendant's penis during the kitchen incident. When Zobrist asked K.C. to describe a time when defendant wiped himself off on the bed sheets in K.C.'s room, K.C. responded:

> "So one day it wasn't that long ago, like when my mom was at work, and then it was the day that—I will not get this right. It was a day that my mom was at work for a little bit until like three. I think. And then. It was the day after um, I mean, day before mom and [defendant] didn't have work. And them um—wait, what did I just say?"

Zobrist replied that K.C. stated it was the day before her mom and dad did not have work and asked if that was correct. K.C. responded, "No, after." Zobrist confirmed her understanding that it was after, and K.C. stated, "Crap. I forgot. Silly baloney." K.C. then stated that she could not "remember at all."

¶ 22    Zobrist then asked K.C. to discuss the last time something with defendant occurred. K.C. advised it was the day she was attempting to talk about. K.C. advised that defendant told K.C. he needed to talk to her. Defendant took K.C. upstairs to her room and made her suck on his "wee wee." Defendant then got on top of K.C. and put his "wee wee" in her "no no square." Defendant got "gooey white stuff" on her shirt so she had to change and shower. K.C. claimed she threw the shirt in the washer. K.C. advised Zobrist that she did not tell anyone about the incidents because defendant told her he would kill her and her sister if she told.

¶ 23    After the video recording was played, K.C. testified via closed-circuit television regarding the alleged sexual incidents involving defendant. K.C. testified that she was 10 at the time of the trial and that she knew the difference between a truth and a lie. K.C. understood that a truth was "something that really happened" and a lie was something that "didn't really happen." K.C. lived with her paternal grandmother at the time of the trial but previously lived with her mother, Johnston, in Salem, Illinois. Defendant, K.C.'s sister, and K.C.'s "meemaw" also lived at her

11

mother's house in Salem. K.C. explained that her "meemaw" was her maternal grandmother. Defendant, whom K.C. referred to as "Devon," was her mother's boyfriend at the time she lived at her mother's house. K.C. denied calling defendant any other name but "Devon."

¶ 24 K.C. identified a photograph of defendant and testified that he "touched" her when she lived at her mother's house. When asked what she meant when she said he touched her, K.C. responded, "Like he would touch me in my vagina." When asked what defendant used to touch her vagina, K.C. responded, "His d*** and a vibrator." The following colloquy then took place between the State and K.C.:

> "Q. Now, your vagina, does it have an inside and an outside?
> A. Yes.
> Q. Okay. Would Devon touch the inside or the outside of your vagina with his d***?
> A. Both.
> Q. Both the outside and the inside?
> A. Yes.
> Q. Okay. Would he touch your vagina with anything else?
> A. No.
> Q. Okay. Did Devon touch the inside of your vagina with his d*** one time or more than one time?
> A. More than once.
> Q. Where would this happen? Where being in the house, at the park, in a car?
> A. In the house.
> Q. In which house?
> A. My mom's house.
> Q. The one that you were living in Salem?
> A. Yes.
> Q. Okay. Where in that house?
> A. In my mom's bedroom, upstairs, and in the kitchen."

¶ 25 K.C. testified that her mother's bedroom was downstairs, or on the main level. K.C.'s bedroom was upstairs. When asked if Devon touched her vagina with his penis in her mother's bedroom and her bedroom, K.C. responded, "Yes, sir." When asked what happened when defendant touched the inside of her vagina with his penis, K.C. responded, "He would push up and down." When this happened, K.C.'s clothes, including her underwear, were off. K.C. described

12

defendant's penis as "black and hairy." K.C. testified that it also happened in the kitchen at her mother's house. K.C. explained that when it happened in the kitchen, her body was on the ground. When asked how it made her body feel when defendant did these things, K.C. responded, "Disgusting." K.C. confirmed that she did not like it. When asked if defendant ever put his penis in any other part of her body, K.C. responded, "My butt" and "My mouth." K.C. explained that defendant, more than once, put his penis inside of her mouth in the kitchen and "made [her] suck on it." K.C. did not remember anything coming out of defendant's penis.

¶ 26 The State asked K.C. if defendant ever touched her vagina with any other part of his body, and K.C. responded, "No. Wait, yes, his tongue." According to K.C., this occurred in her bedroom and her mother's bedroom. K.C. confirmed that her clothes, including her underwear, were off when defendant touched her vagina with his tongue. When asked how her body was positioned when this occurred, K.C. responded, "I was just laying down" on the bed.

¶ 27 The State then inquired further about the incident in the kitchen. K.C. explained that she was watching television with her siblings before the incident in the kitchen. The following exchange then took place between the State and K.C.:

> "Q. Okay. How did you end up in the kitchen then?
> A. We were cooking.
> Q. Okay. Where were your stepbrothers and your sister?
> A. In bed.
> Q. Okay. So were they in the kitchen with you?
> A. Yes.
> Q. Was their bed in the kitchen?
> A. No. They were in the kitchen for about two hours with us.
> Q. But when things happened with Devon, were they still in the kitchen?
> A. No.
> Q. Okay. Where were they then?
> A. Upstairs in their bedroom."

K.C. restated that her body was on the ground when the kitchen incident occurred. K.C. then stated that something happened in the kitchen once or twice. K.C. did not recall if defendant said anything to her in the kitchen when this happened.

¶ 28     K.C. confirmed that defendant touched her vagina with his tongue in her mother's bedroom and her bedroom. K.C. confirmed that her clothes were off but defendant's clothes were on when this occurred. K.C. then testified that defendant put his penis in her mouth "[o]ne time" in the kitchen.

¶ 29     When the State asked K.C. if she used another word for vagina, she responded, "No." When asked what defendant did after he put his penis in her vagina or mouth, K.C. responded, "He would wipe it off." K.C. elaborated that he wiped it off on her mom's sheet or a towel. She did not recall him wiping his penis off on anything else.

¶ 30     On cross-examination, K.C. admitted that she was uncomfortable testifying at trial. Defense counsel then posed the following question: "You are a very attractive young lady, you know that, don't you?" K.C. responded, "No." K.C. then denied that she had any boyfriends at school, stating that she was "not allowed to" because she was "too young." When asked why she no longer lived with her mother, K.C. responded, "Because I got raped and I got taken away from her." When asked if she liked defendant, K.C. responded, "A little bit." K.C. played games with defendant sometimes. K.C. confirmed that she learned the word "d***" from her mother. K.C. did not tell her mother that defendant put his penis in her in the beginning, claiming that she did not tell her mother anything about what happened with defendant. K.C.'s mother found out because K.C.'s "cousin went up to her mom and then her mom called our mom and so our mom asked us." K.C. initially denied that defendant touched her but then admitted it to her mother. K.C. claimed that her mother and defendant were getting along when her mother asked her about the touching.

14

¶ 31    K.C. testified on cross-examination that she called defendant's penis a "wee wee" during the interview with Zobrist. K.C. did not know what caused her to refer to defendant's penis as a "d***" at trial. K.C. also did not know why she called her vagina a "no-no" during the interview. K.C. claimed she heard the word vagina in a movie. K.C. initially agreed that defendant was good to her but then testified that he would scare her occasionally by scraping a knife on the floor while they were watching a scary movie. The following exchange then occurred between defense counsel and K.C.:

> "Q. That's like—now, you and Devon had to have some kind of a relationship for him to have—have sex with you, didn't you? Didn't he say nice things to you?
> A. Yes.
> Q. What did he say to you?
> A. He said like I was beautiful or something like that.
> Q. Well, that's the truth. Okay. Did he give you any candy or anything like that?
> A. No.
> Q. He just said you were beautiful?
> A. Yes.
> Q. Did you kind of have a crush on him?
> A. No.
> Q. Not at all?
> A. No.
> Q. So I'm to take it from your testimony that after school at one point he reached down in your pants?
> A. Yes."

¶ 32    Defense counsel then posed the following question: "What did he do, just put his finger in there?" K.C. replied, "He would wiggle his finger around in it." K.C. testified that this occurred one time. K.C. did not recall the specific timeframe in which defendant put his penis in her vagina. K.C. had difficulty recalling the specific details regarding the sexual instances on cross-examination. She did recall that defendant's penis was large. When asked if defendant put his entire penis inside of her, K.C. responded, "No, not that I remember." When asked if she ever kicked defendant in the "nuts," K.C. responded, "No." The following colloquy then took place between defense counsel and K.C. regarding the incident in the kitchen:

15

"Q. Okay. I'll settle for that. How did you—you said you got up on the kitchen counter?

A. No.

Q. Did he put you on the kitchen counter?

A. No.

Q. Okay. So there was nothing about the kitchen counter.

A. No.

Q. Nothing ever happened on the kitchen counter?

A. No.

Q. Okay. Now, did your mom ever ask you about whether or not he ever put his d*** in your mouth? Did she ever ask you that?

A. No.

Q. All being said, you've got a very small mouth, don't you? I mean, you got a small mouth, don't you?

A. I don't know.

Q. All right. It's average but it suits you, all right?

A. Okay.

Q. Now, how—did he just out of the blue put his d*** in your mouth?

A. Yes.

Q. How—did he say anything?

A. He told me to put my mouth on his d***.

Q. He just told you that?

A. Yes.

Q. And I guess he was—had his pants off?

A. Yes.

Q. And you were just there. Were you playing games with him?

A. Yeah, we were playing Fortnite.

Q. You were playing Fortnite?

A. Yes.

Q. And he just all of a sudden popped his pants down and asked you if he could put his d*** in your mouth, right?

A. Yes.

Q. Is that kind of how it happened?

A. Kind of.

Q. He didn't say that he cared about you or that you were good looking or sweet?

A. No.

Q. So when he put his d*** in your mouth, did you bite it?

A. No.

Q. What did you do?

A. Sucked on it.

Q. How long was his d*** in your mouth?

A. I don't remember.

Q. It wasn't something that you would remember?

A. No.

Q. Okay. And how many times did this happen?

A. Once.

16

Q. Oh. And when he put his d\*\*\* in your mouth, and you are a very brave and wonderful young lady, I want to say that to you.

A. Thank you.

Q. When he put his d\*\*\* in your mouth, did anything come out of his d\*\*\*?

A. No."

¶ 33    K.C. again confirmed on cross-examination that defendant only put his penis in her mouth on one occasion. When asked how many times he put his penis in her vagina, she responded, "More than once." She clarified that it occurred more than four times; however, she could not recall the dates or times. She also could not recall the specific details regarding the incidents. K.C. could not recall if defendant put his entire penis in her vagina. K.C. denied that this caused her pain. K.C. denied having any bleeding or soreness after defendant put his penis in her vagina. K.C. recalled that her mother gave police the sheets that she "got raped on." K.C. specified that the sheets provided to police were on her mother's bed. K.C. also recalled that her mother gave police one of her shirts and a pair of her shorts. K.C. claimed that defendant attempted to put his penis in her rectum but it would not go in. The following colloquy then took place between defense counsel and K.C.:

"Q. Now, was there a time that you kicked him in the nuts?

A. No.

Q. Okay. I think I asked you that before. You get old and you repeat yourself. Don't get old.

Now, God bless you, you are a beautiful little girl.

When he asked you to suck on his d\*\*\*, did anything come out of it?

A. No.

Q. You never saw any white gooey stuff?

A. I don't know."

K.C. recalled going to Cardinal Glennon Hospital in St. Louis, Missouri, where medical personnel examined her vagina. K.C. did not recall anyone discussing the findings of the examination with her.

17

¶ 34    On redirect, K.C. testified that her interview with Zobrist took place shortly after the sexual incidents with defendant occurred. K.C. explained that it had been a long time since the incidents occurred. K.C. confirmed that defendant reached in her pants and wiggled his finger inside of her vagina on one occasion.

¶ 35    Christopher Frasca, a forensic scientist employed by the Illinois State Police, testified for the State. Frasca was admitted as an expert in the field of forensic biology and DNA analysis without objection from the defense. Frasca tested the items Johnston provided to Salem police for the presence of semen. Frasca observed stains on K.C.'s shirt, cut the stained areas from the shirt, and tested those areas for the presence of semen. The testing revealed the presence of semen on the shirt. Frasca next obtained a DNA profile from the semen found on the shirt. Frasca subsequently determined that defendant "could not be excluded or he was included as contributing to that profile."

¶ 36    Following Frasca's testimony, defense counsel moved for a directed verdict. The trial court, stating that it was required to view the evidence in a light most favorable to the prosecution, noted that defendant's semen was found on K.C.'s shirt. The court also noted that K.C.'s testimony and recorded interview demonstrated that defendant rubbed his penis "up and down" on K.C.'s vagina and stuck his penis in K.C.'s mouth. Accordingly, the court denied the motion for directed verdict.

¶ 37    Defendant then testified on his own behalf. Defendant was in a relationship with Johnston for approximately two years and lived with her during that time. Several children lived in the home with defendant and Johnston, including K.C., K.C.'s sister, and defendant's two sons. Johnston directed defendant to remove his belongings from the home in August 2021. Defendant confirmed that he heard Zobrist's testimony, K.C.'s testimony, and the contents of K.C.'s recorded interview.

18

Defendant claimed that none of K.C.'s allegations were true. Defendant specifically denied putting his penis in K.C.'s mouth, putting his penis in K.C.'s vagina, and putting his penis in K.C.'s rectum. When asked if he had a very large penis, defendant responded, "Yes, I do." Defendant confirmed that his penis size caused problems with his ex-wife. Defendant additionally denied putting his hands down the front of K.C.'s vagina.

¶ 38   Defendant testified that he did not know why K.C. made the allegations against him. Defendant explained that he had issues with K.C.'s aunt, whom he referred to as "Samantha" or "Sam." Defendant and Samantha "had multiple problems" and "just didn't get along with each other." When asked about the presence of his semen on K.C.'s shirt, defendant responded, "Me and Christy could have been having sex in the room and I just grabbed anything that was nearby and just wiped myself off." Defendant elaborated, "We have done it multiple times. She does it, I do it." Defendant admitted that he also masturbated and grabbed "whatever [was] close to [him] and wipe[d] with that." When asked if he recalled wiping himself off with K.C.'s shirt, he responded, "It's possible."

¶ 39   On cross-examination, defendant admitted that he was not a medical professional and was not qualified to offer a professional opinion on whether his penis could cause damage to a child. Defendant believed that Samantha did not like him and, thus, planted false ideas in K.C.'s mind. Defendant did not want Samantha around because Samantha posted a video on social media of Johnston while Johnston was intoxicated, which caused Johnston to lose her children. Defendant explained that "whenever Sam[antha] sees the opportunity to be allowed to be with these children alone it's easy to, you know, mess up a narrative and get in her head and say things." Defendant stated, "If it wasn't for Sam[antha], none of this would be going about." Defendant then stated, "Christy said it herself, that Sam[antha] came to her at work and told her these things." When

19

asked about K.C.'s statement to Zobrist and her trial testimony, defendant responded, "It could have been coerced."

¶ 40    Danielle Hutchison next testified for the defense. Hutchison was previously in a relationship with defendant, and they had two children together. During their relationship, they had sex once a week. When asked if defendant had a very large penis, Hutchison responded, "Yes. That's why I did not have a lot of sex with him." Hutchison explained that she would bleed after she had sex with defendant and that it was very uncomfortable.

¶ 41    Hutchison additionally testified that she had a three-year-old daughter, Maci Hutchison, with another man, and that Maci lived with defendant. Defendant treated her daughter well and he watched her while Hutchison was at work. Hutchison was unaware of anything unusual happening between defendant and her daughter. On cross-examination, Hutchison clarified that her daughter was 9 or 10 when her relationship with defendant ended.

¶ 42    Maci, Hutchison's daughter, also testified for the defense. At the time of the trial, Maci was 13 years old. Maci lived with defendant for approximately six years. Maci denied that defendant exhibited improper behavior towards her and claimed he treated her well during that time.

¶ 43    After considering the evidence, the trial court found defendant guilty on all counts. In doing so, the court stated:

> "Now, the State has argued, argued about the minor's testimony. I find the minor's testimony under oath yesterday was somewhat tainted. What I—I come to that conclusion because I notice she also was describing what occurred to her as rape. Now, was it just acquiring some type of new vocabulary that caused her now to characterize what happened

20

as rape. Then she changed her vocabulary even more. We went from no-no square to vagina. We went from wee wee to d***.

Now, that somewhat, to my estimation, taints the testimony. And I also found it a little tainted because she didn't recall the ejaculation by the defendant. Her testimony yesterday was, no, she didn't recall that. Of course, we got [*sic*] to be cautious not recalling and it not happening are two different things. But, on the other hand, she did not recall it. So I felt it was important to go back and watch the video again. And keep in mind that this video occurred, I believe, on August 17th, very close in time to the alleged last event. And she described that last event. It was upstairs in her room, she had her pants off, he had his pants off. He had her suck on his wee wee and then he climbed on top of her but not hard. Now, not hard implies to me he wasn't bearing down on her. Her shorts and underwear was [*sic*] off. That gooey stuff came out and got on her shirt. Not only was she able to say it got on her shirt, it got on this shirt, not any shirt, she described this shirt.

Now, then we have to start looking at the probability here. What would be the probability that she would describe a shirt that he just happened to pick up after he masturbated and cleaned off? That is not reasonable. She was able to describe the shirt. Now, she went on to say she put the shirt in the washer because she wanted to wash it so she could wear it again. She didn't say she washed the shirt, she said she put it in the washer.

***

So, I found her interview, again, it was conducted close in time by a qualified forensic interviewer. We were able to observe it, I admitted it over the objection because I felt it met the requirements of the statute to come in. I find that interview far more

21

enlightening and far more relevant and far more revealing as to what actually occurred than her testimony here later. That may be a basis for the Appellate Court to consider this. I've seen cases regarding that proposition. But, obviously, her statement in the interview being close in time, conducted by a trained individual, recorded on video, so it was available as it was said far more enlightening and far more determined.

So what happened on that day? I believe the State has proved beyond a reasonable doubt that on that day he had the child upstairs, he took the child upstairs, he took—had her take off her pants, her underwear, he had her suck on his wee wee, which is one—well, and that he climbed on top of her and rubbed his penis up and down on the exterior of her vagina acknowledging that he may have injured her otherwise, and then when he ejaculated he ejaculated on her chest and shirt. I think that's what happened on that day. I think the State has proved that beyond a reasonable doubt."

The court also found defendant guilty on count III, based on K.C.'s statement that defendant "dug into her vagina with his fingers." Regarding the allegation that defendant placed his mouth on K.C.'s vagina, the court stated as follows:

"Now, in that occurrence, if the Court finds the conduct did not happen, I don't believe—well, this count has caused me some concern, because she testified I believe it happened a couple of times he placed his tongue on her vagina. But considering the credibility she demonstrated on the rest of it, I'm going to take her word for it. I'm going to find he's guilty on that."

¶ 44    On June 28, 2023, defendant file a posttrial motion alleging that the trial court's findings "failed to find [him] guilty beyond a reasonable doubt" for the following reasons: defendant credibly testified that he did not commit the alleged sexual acts; it was physically impossible for

22

defendant to place his penis inside of K.C. due to its size, as confirmed by defendant's ex-girlfriend, Danielle Hutchison; Hutchison's daughter testified that defendant did not exhibit any sexual behavior towards her when he lived with her; defendant's wife, Christy Johnston, did not know about the allegations until K.C. told her; the court erred by allowing Zobrist and K.C.'s hearsay testimony and by denying defendant a separate reliability hearing; K.C.'s testimony contradicted her video-recorded statements; medical evidence demonstrated that K.C. had no bruising or lacerations to her vagina and that her hymen was intact, demonstrating no physical evidence of trauma; and the court disregarded defendant's explanation that he wiped his penis on K.C.'s shirt. Defendant further alleged that the court should have reduced the charges to predatory sexual assault, where the evidence, at most, demonstrated that defendant rubbed or touched K.C. without penetration.

¶ 45 On August 23, 2023, the trial court addressed defendant's posttrial motion at the sentencing hearing. The court acknowledged the inconsistencies between K.C.'s recorded statement and her trial testimony. The court stated that it "weighed it now, [it] weighed it then at the time of trial, and [it would] weigh it again now." The court concluded that her testimony was "inconsistent on the small degrees, it was fairly consistent with the major items." The court specifically noted the inconsistency regarding the alleged kitchen incident and whether "anything came out of [defendant's] penis." The court then stated, "However, the convincing factor then during my consideration of the evidence and the convincing factor now is the fact that she was able to say, with certainty, that he used her T-shirt to clean himself up." The court found the evidence demonstrating the presence of defendant's semen on K.C.'s shirt corroborated K.C.'s recorded statement. The court also addressed the medical evidence, stating that K.C.'s testimony indicated

that defendant moved his penis up and down, not in and out. The court explained that there was no "intercourse in this case." The court went on to state:

> "She described him placing his mouth on her vagina. She described him placing his penis in her mouth and she described using his finger. Now, am I—did it cause me some consideration that her testimony at trial under oath was inconsistent with her—the results of her interview? Yes, it did. But I weighed it, and considering the fact that the T-shirt verified the credibility of her interview at the Amy Center, I had to find that credible."

Thus, the court denied defendant's posttrial motion and sentenced him to a prison term totaling 42 years, to be served at 85%.

¶ 46                                   II. ANALYSIS

¶ 47    On appeal, defendant argues that (1) the State's evidence was insufficient to convict him of the four counts of predatory criminal sexual assault of a child, (2) the trial court abused its discretion by admitting hearsay evidence pursuant to section 115-10 of the Code, and (3) trial counsel was ineffective. We address these contentions in turn.

¶ 48    A. Sufficiency of the Evidence

¶ 49    Defendant first argues that the State failed to prove him guilty beyond a reasonable doubt of predatory criminal sexual assault of a child where the verdict rested on K.C.'s hearsay statements. Defendant maintains that K.C.'s statements were "internally inconsistent" and "directly contradicted" by her trial testimony.

¶ 50    Due process requires proof beyond a reasonable doubt of each element of the offense charged before an accused may be convicted of the offense. *People v. Young*, 128 Ill. 2d 1, 48 (1989) (citing *In re Winship*, 397 U.S. 358, 364 (1970)). The question before this court in a challenge to the sufficiency of the evidence is whether, viewing the evidence in the light most

24

favorable to the prosecution, any reasonable trier of fact could have found all of the elements of the offense beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). This court must draw all reasonable inferences from the evidence in favor of the State. *Id.* at 116-17. Our role is not to retry the defendant. *Id.* at 114. Instead, this court must recognize that the fact finder saw and heard the witnesses when they testified, and, as such, was in a better position than we are to assess the credibility of those witnesses. *Id.* at 114-15. We will reverse a conviction on the basis of insufficient evidence only if we find that "the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of [the] defendant's guilt." *Id.* at 115.

¶ 51    A person commits predatory criminal sexual assault of a child if that person is 17 years of age or older, and commits an act of contact, however slight, between the sex organ or anus of a person who is under 13 years of age for the purpose of sexual gratification or arousal of the victim or the accused. 720 ILCS 5/11-1.40(a)(1) (West 2020).[2] Defendant, here, was charged with predatory criminal sexual assault of K.C. pursuant to the penetration clause in the statute. At issue here is whether the State presented sufficient evidence to prove that defendant committed four separate acts of sexual penetration with K.C.

¶ 52    In the present case, this court cannot conclude that the evidence was so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt on the four counts of predatory criminal sexual assault of a child. In so concluding, we acknowledge that there were inconsistencies between K.C.'s trial testimony and the statements she made in her recorded interview. We note, however, that the trial court acknowledged these inconsistencies and concluded that the statements K.C. made in her recorded interview, which were closer in time to

---

[2]It is undisputed that defendant was over the age of 17 and that K.C. was under the age of 13 when the alleged acts occurred.

25

the alleged acts, were more persuasive. The court noted that K.C. used different words to describe penis and vagina at trial as compared to her recorded interview. The court also noted that K.C.'s testimony was inconsistent "on the small degrees," but "was fairly consistent with the major items." See *People v. Carter*, 2022 IL App (1st) 210261, ¶ 50 (minor inconsistencies in a witness's testimony do not "automatically create a reasonable doubt" (internal quotation marks omitted)). The court specifically noted several inconsistencies, including K.C.'s testimony regarding the kitchen incident and her testimony that "she didn't see anything come out of [defendant's] penis." The court noted that, although K.C. did not see anything come out of defendant's penis, she consistently recalled that he wiped himself off on various items, implying that "something did come out of his penis, she just didn't see it." The court further noted that the evidence establishing the presence of defendant's semen on K.C.'s shirt, an item K.C. claimed defendant wiped himself on, substantiated the version of events she relayed to Zobrist during the recorded interview. Moreover, the court acknowledged the medical evidence that indicated K.C. suffered no physical trauma but concluded that defendant rubbed his penis "up and down on her" without having intercourse with her. Thus, the record reveals that the court carefully reviewed and weighed the evidence in finding K.C. credible. See *Wheeler*, 226 Ill. 2d at 114-15 (this court must recognize that the fact finder saw and heard the witnesses when they testified, and, as such, was in a better position than we are to assess the credibility of those witnesses). Under these circumstances, this court will not reweigh the evidence and substitute our credibility determination for that of the trial court.

¶ 53    With this in mind, we consider whether the State presented sufficient evidence to prove defendant guilty of the four counts of predatory criminal sexual assault. Count III alleged that defendant committed an act of sexual penetration with K.C. by placing his finger in the vagina of

26

K.C. The State submitted K.C.'s recorded interview and trial testimony to establish defendant's guilt on count III. During the recorded interview, K.C. advised Zobrist that the first incident with defendant occurred when defendant "just started putting his hands in her pants" and "digging into [her] no no square" when she came home from her last day of school. When asked, K.C. confirmed that defendant touched "inside" her "no no square." The evidence demonstrated that K.C. used the words "no no square" to describe her vagina. While K.C. did not specifically testify that defendant used his hand or finger to touch her vagina on direct examination, she generally testified that defendant "would touch [her] in [her] vagina." K.C. provided more descriptive testimony regarding defendant placing his finger inside of her vagina on cross-examination. Specifically, when asked if defendant "reached down in [K.C.'s] pants," K.C. responded, "Yes." Defense counsel then asked, "What did he do, just put his finger in there?" K.C. responded, "He would wiggle his finger around in it." K.C. confirmed that this happened on one occasion. K.C. also confirmed on redirect examination that defendant reached in her pants and wiggled his finger inside of her vagina on one occasion. K.C.'s trial testimony in this regard was consistent with the statement she made in her recorded interview. Accordingly, this evidence, when viewed in a light most favorable to the State, was sufficient to prove defendant guilty of count III.

¶ 54    Defendant complains that K.C. provided inconsistent stories regarding defendant's act of placing his finger inside of her vagina. Defendant notes that during the recorded interview, K.C. provided conflicting accounts of who picked her up from school on the date of the alleged act and who was in the house when the act occurred. Defendant further notes that K.C. testified that she did not know what it meant to "dig into her no no square" when she subsequently testified at trial. K.C. also testified that she did not kick defendant "in the nuts," while she advised Zobrist in the recorded interview that she kicked defendant "in the nuts" when he dug into her "no no square."

27

Contrary to defendant's argument, we conclude that these were minor inconsistencies that did not affect the trial court's determination of guilt on this count. We note that K.C. was asked to recall specific details regarding events that took place nearly two years before trial. The trial court was in the best position to resolve the conflicts in her testimony, and we decline defendant's invitation to reweigh the evidence on appeal.

¶ 55    Counts IV and VI alleged that defendant committed an act of sexual penetration with K.C. by placing his penis in the vagina of K.C. (count IV) and placing his penis in the mouth of K.C. (count VI). The State submitted K.C.'s recorded interview and trial testimony to establish defendant's guilt on count IV. During the recorded interview, Zobrist asked K.C. if "anything else ever happened with [defendant] at a different time," and K.C. responded that defendant "always used to put his wee wee inside of [her]" and "always made [her] suck on it." The evidence demonstrated that K.C. used the term "wee wee" to describe a penis. When asked to describe a time defendant placed his penis inside of her, K.C. advised of an incident that occurred on her kitchen counter. K.C.'s description of the kitchen counter incident during the recorded interview was difficult to follow. However, K.C. also advised Zobrist of a time that defendant put his "wee wee" in her "no no square" in her bedroom upstairs. K.C. further advised that defendant made her suck on his "wee wee" upstairs. K.C. recalled during the recorded interview that defendant got "gooey white stuff" on her shirt during the incident in her bedroom.

¶ 56    At trial, K.C. testified that defendant touched the inside and outside of her vagina with his penis on more than one occasion and that he made her place his penis in her mouth on one occasion. K.C. testified that this occurred in her mother's bedroom, upstairs, and in the kitchen. When asked to elaborate on the touching she referred to, K.C. explained that defendant "would push up and down" on her vagina with his penis while her clothes were off. K.C. described defendant's penis

28

as "black and hairy." K.C. did not like when defendant put his penis in her vagina, testifying that it made her feel "disgusting." Unlike her recorded interview, K.C. did not recall anything coming out of defendant's penis when she testified at trial. However, as the trial court correctly noted, the evidence demonstrated that defendant's semen was found on K.C.'s shirt. Moreover, as the court correctly noted, the evidence demonstrated that defendant pushed his penis up and down on K.C.'s vagina, which was consistent with the finding of no physical trauma in the medical report. This evidence, when viewed in a light most favorable to the State, was sufficient to prove defendant guilty of counts IV and VI.

¶ 57     Count V alleged that defendant committed an act of sexual penetration with K.C. by placing his mouth on the vagina of K.C. The State submitted K.C.'s recorded interview and trial testimony to establish defendant's guilt on count V. During the recorded interview, K.C. advised Zobrist that defendant touched her vagina with his tongue during the kitchen incident. As noted, K.C.'s description of the kitchen incident was difficult to follow in her recorded interview. At trial, K.C. testified that defendant touched her vagina with his tongue in her mother's bedroom and her bedroom. This evidence, when viewed in a light most favorable to the State, was sufficient to prove defendant guilty of count V.

¶ 58     Defendant complains that K.C.'s recorded statement directly contradicted her trial testimony, where her recorded statement indicated defendant used his tongue to touch her vagina in the kitchen while her trial testimony indicated this occurred in the bedrooms. Defendant specifically notes that K.C. advised Zobrist that defendant touched her vagina with his tongue on the kitchen counter, while she denied that anything occurred on the kitchen counter at trial. As noted, the trial court considered these inconsistencies and found K.C. credible. Defendant highlights the court's statement that it was "uncertain when [the conduct charged in count V]

29

occurred," arguing that this statement demonstrates there was insufficient evidence to convict him on this count. In our view, however, it demonstrates that the court was carefully reviewing and weighing the evidence in making a credibility determination.

¶ 59    Thus, we conclude that, when viewing the evidence in a light most favorable to the State, a reasonable trier of fact could have found all of the elements of the offenses beyond a reasonable doubt. Accordingly, we hold that the State's evidence was sufficient to prove defendant guilty of the four counts of predatory criminal sexual assault of a child.

¶ 60    B. Admission of Video-Recorded Interview

¶ 61    Defendant argues that the trial court abused its discretion by admitting evidence pursuant to section 115-10 of the Code, where the court's reliability finding was unsupported by the relevant factors and rested on consideration of improper factors. Defendant also maintains that the court failed to conduct the statutorily-mandated reliability hearing.

¶ 62    In a prosecution for a physical or sexual act perpetrated upon or against a child under 13 years of age, section 115-10 of the Code allows the State to introduce the following testimony as an exception to the hearsay rule:

> "(1) testimony by the victim of an out of court statement made by the victim that he or she complained of such act to another; and
>
> (2) testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim." 725 ILCS 5/115-10(a)(1), (2) (West 2020).

Such testimony shall only be admitted into evidence if:

30

"(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child *** either:

(A) testifies at the proceeding; or

(B) is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement[.]" *Id.* § 115-10(b)(1), (2)(A)-(B).

¶ 63    As an initial matter, we reject defendant's contention that the trial court committed reversible error by failing to conduct a separate reliability hearing in the present case. While it is undisputed that the court did not hold a separate reliability hearing and we agree with defendant that the statutory requirement of a "hearing outside the presence of the jury" is not entirely inapplicable to bench trials, we note that "the trial judge is presumed to have considered only admissible evidence." *People v. Burnett*, 239 Ill. App. 3d 582, 586 (1993). Accordingly, this court may presume that the trial judge considered "the time, content, and circumstances under which the statement was made in determining the reliability of the statement." *Id.* (citing *People v. Roy*, 201 Ill. App. 3d 166 (1990)).

¶ 64    This is especially true where, as here, defense counsel advised the trial court at the outset of trial that a reliability hearing was necessary and the court indicated that, in a bench trial, it could make the determination when the evidence was offered at trial. The court further stated that it would allow defense counsel to renew the objection and disregard the contents of the video recording if it ultimately agreed with defense counsel's objection. During Zobrist's trial testimony, defense counsel objected, noting that the court needed to make "an assessment of the child's testimony," and the State noted the relevant factors were "the time, circumstances, and manner of

31

the hearsay statement that is sought to be admitted bearing some indicia of reliability." The court noted the objection and stated that the parties could discuss the objection after Zobrist's testimony and the court's review of the video recording. The court further stated that it was required to conduct the hearing "outside the jury" and find "sufficient safeguards of reliability." The court noted that it "may strike it" after hearing the testimony and reviewing the recorded interview. In addressing the recorded interview after the parties presented evidence, the court stated, "I admitted it over the objection because I felt it met the requirements of the statute to come in." Under these circumstances, we presume the court considered the relevant factors before considering the statements at issue and, thus, we conclude that the court's failure to hold a separate hearing did not constitute reversible error.

¶ 65 We now consider defendant's argument that the State failed to meet its burden of establishing that the time, content, and circumstances of the statement provide sufficient safeguards of reliability, as required by section 115-10 of the Code. "The State, as the proponent of the out-of-court statements sought to be admitted pursuant to section 115-10 of the Code, bears the burden of establishing that the statements were reliable and not the result of adult prompting or manipulation." *People v. Sharp*, 391 Ill. App. 3d 947, 955 (2009). "There are no precise tests for evaluating trustworthiness or reliability, but rather particularized guarantees of trustworthiness must be drawn from the totality of the circumstances surrounding the victim's statements." *People v. Rottau*, 2017 IL App (5th) 150046, ¶ 55 (citing *People v. West*, 158 Ill. 2d 155, 164 (1994); *People v. McMillan*, 231 Ill. App. 3d 1022, 1025 (1992)). "Important factors in determining reliability include the child's spontaneous and consistent repetition of the incident, the child's mental state, the use of terminology expected of a child of a similar age, and lack of motive to fabricate." *Id.* (citing *People v. Bowen*, 183 Ill. 2d 103, 120 (1998); *West*, 158 Ill. 2d at 164).

¶ 66 "A trial court has considerable discretion in admitting hearsay statements; therefore, a reviewing court will not disturb a trial court's decision absent an abuse of discretion." *Id.* (citing *People v. Zwart*, 151 Ill. 2d 37, 44 (1992)). A trial court abuses its discretion "when the trial court's determination is arbitrary, fanciful, or unreasonable or when no reasonable person would agree with the stance adopted by the trial court." *People v. Applewhite*, 2016 IL App (4th) 140558, ¶ 57 (citing *People v. Becker*, 239 Ill. 2d 215, 234 (2010)).

¶ 67 In applying this deferential standard of review, we conclude that the trial court did not abuse its discretion by admitting K.C.'s recorded interview under section 115-10 of the Code. We acknowledge that K.C. delayed reporting the alleged assaults and that K.C. initially denied the alleged assaults took place when questioned by her mother; however, "a delay in reporting an assault or initial denials of assault will not automatically render a victim's statements inadmissible under section 115-10 of the Code." *Sharp*, 391 Ill. App. 3d at 955 (citing *Zwart*, 151 Ill. 2d at 46). We also note that Zobrist interviewed K.C. the day after K.C. advised her mother of the alleged assaults. This was several months after the alleged assaults began. In our view, it was not unreasonable for the trial court to find the statements in K.C.'s recorded interview occurred close in time to the alleged assaults.

¶ 68 During the interview, K.C. initially became emotional and uncomfortable when Zobrist questioned her regarding the alleged assaults. K.C. subsequently advised Zobrist that she did not tell anyone about the alleged assaults because defendant threatened to kill her and her sister if she told. This could be viewed as an explanation for K.C.'s reluctance to provide information to Zobrist. The recorded interview reveals that Zobrist followed the standard protocol by asking primarily open-ended questions. Zobrist asked closed-ended questions to facilitate communication when K.C. was unwilling to talk or struggling with open-ended questions. Contrary to defendant's

33

claim, nothing suggests that the questions Zobrist asked were unduly suggestive. See *People v. Branch*, 158 Ill. App. 3d 338, 342 (1987) ("The fact that a complaint is made in response to questioning *** does not necessarily destroy its admissibility."). Although the details surrounding the alleged assaults were difficult to follow at certain points during the interview, K.C. clearly accused defendant of placing his finger in her vagina, placing his penis in her vagina, placing his tongue in her vagina, and placing his penis in her mouth. Any inconsistencies raised questions regarding K.C.'s credibility, which defense counsel highlighted at trial. However, this court cannot conclude that the trial court abused its discretion by determining that the statements in K.C.'s recorded interview were sufficiently consistent to demonstrate their reliability.

¶ 69    We acknowledge defendant's argument that K.C.'s mother coached K.C. where her mother told K.C. to "tell [Zobrist] what [K.C.] said last time." We also acknowledge that K.C. appeared to use certain terminology in the interview that would not be used by most eight-year-old children. Notably, K.C. referred to "a nut" when describing the "white gooey stuff" that came out of defendant's penis. K.C. appeared to learn this phrase from her mother, who advised K.C. that the "white gooey stuff" got "people pregnant." K.C. claimed she understood this because her mother had nine children. Despite this, there is nothing in the record to suggest that K.C.'s mother had a motive to persuade K.C. to fabricate allegations against defendant. Although K.C.'s mother may have attempted to explain certain sexual terms to K.C., K.C.'s mother testified that she did not discuss details of the alleged assaults with K.C. In our view, it would have been reasonable for the trial court to conclude that K.C.'s use of these terms did not render her recorded statement unreliable under section 115-10 of the Code.

¶ 70    Defendant maintains that K.C. had motive to fabricate the allegations against him, where her statements and testimony revealed that she felt defendant did not want her around and that she

34

spent less time with her mother when defendant lived with them. In our view, however, it would have been reasonable for the trial court to conclude that K.C. did not have a clear motive to fabricate the assault allegations against defendant.

¶ 71    Defendant additionally maintains that the trial court improperly considered the evidence establishing the presence of defendant's semen on K.C.'s shirt by finding K.C.'s recorded statement reliable. It is unclear, however, that the court considered this evidence in making its reliability determination. Instead, it appears that the court was merely weighing the evidence and making a credibility determination. Thus, we reject defendant's argument in this regard.

¶ 72    In sum, we cannot say that the trial court's reliability determination was arbitrary, fanciful, or unreasonable. Therefore, we conclude that the trial court did not abuse its discretion by finding that K.C.'s recorded interview was sufficiently reliable to warrant admission under section 115-10 of the Code.

¶ 73    C. Ineffective Assistance of Counsel

¶ 74    Defendant argues that trial counsel was ineffective where counsel (1) failed to request a separate reliability hearing prior to the admission of K.C.'s video-recorded statement, (2) centered defendant's defense on a legally untenable theory, and (3) asked wholly inappropriate and distasteful questions in cross-examining K.C. regarding the charged acts.

¶ 75    Both the federal and Illinois Constitutions guarantee a criminal defendant the right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668, 687-89 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). "In order to succeed on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's representation fell below an objective standard of reasonableness (deficiency prong) and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings

35

would have been different (prejudice prong)." *People v. Boyd*, 2018 IL App (5th) 140556, ¶ 16 (citing *Strickland*, 466 U.S. at 687-88).

¶ 76    As an initial matter, we conclude that defendant is unable to show that he suffered prejudice as a result of defense counsel's failure to request a reliability hearing prior to trial. While it is undisputed that defense counsel did not request such hearing prior to trial, counsel did insist that the trial court make this determination before the court admitted the evidence at trial. In addition, defense counsel made repeated objections to the hearsay evidence at trial and included the issue in a posttrial motion. As a result of defense counsel's actions, the trial court was well aware of the determination it was required to make prior to admitting the recorded interview into evidence at trial. Moreover, as we concluded above, the court did not abuse its discretion by admitting the recorded interview under section 115-10 of the Code. For these reasons, defendant is unable to show that there was a reasonable probability that the result of the proceedings would have been different had defense counsel requested a separate reliability hearing prior to trial.

¶ 77    We also reject defendant's assertion that defense counsel was ineffective for basing his defense "almost exclusively on the size of [defendant's] penis." Under the deficiency prong, "a defendant must overcome a presumption that his counsel's conduct fell within a broad range of professional representation, and decisions regarding defense strategy made after a thorough investigation of the law and facts are not effectively challenged unless that strategy is found to be unsound." *People v. Smith*, 242 Ill. App. 3d 555, 565 (1993). "Defense counsel's decision to rely on one theory of defense to the exclusion of other theories is generally a matter of trial strategy [citation], so allegations arising from matters of judgment or defense counsel's trial strategy usually will not support a claim that counsel's representation was ineffective." *Id.*

36

¶ 78    Here, defense counsel's theory throughout the trial was that K.C. fabricated the allegations of sexual assault against defendant. In an effort to support this theory, defense counsel presented evidence demonstrating that defendant had a large penis and that his penis caused his former adult partners to bleed or suffer severe discomfort. In addition, defense counsel presented medical evidence demonstrating that K.C. was found to have no physical trauma following the alleged incidents. Defense counsel also highlighted the inconsistencies between K.C.'s recorded interview and trial testimony in an attempt to discredit her at trial. Although defense counsel was ultimately unsuccessful, his attempt to discredit K.C. constituted reasonable trial strategy. Thus, a review of the record and defendant's contentions has failed to show that defense counsel's performance in this regard was deficient.

¶ 79    Lastly, we address defendant's assertion that defense counsel's "approach to cross-examination of K.C. was inexplicable." As defendant correctly notes, defense counsel began his cross-examination of K.C. by asking if she knew she was "a very attractive young lady." When K.C. advised defense counsel that defendant had called her beautiful, defense counsel responded, "Well, that's the truth." At one point, trial counsel stated, "God bless you, you are a beautiful little girl," before asking K.C. about an act of fellatio forced upon her. While this court agrees with defendant that defense counsel's line of questioning was, at times, alarming, it is acknowledged that such questions "might not suffice to establish an ineffectiveness claim on their own." We find that the questioning of the victim herein did not constitute a deficient performance by counsel. Thus, in total, we conclude that defense counsel's performance did not constitute ineffective assistance.

¶ 80        III. CONCLUSION

¶ 81 For the foregoing reasons, we affirm the Marion County circuit court's judgment of conviction.

¶ 82 Affirmed.